for student and teacher supplies.[5]  On October 8, 2002, Mr. Masters informed appellant that the metal cabinet was going to be removed from her classroom by the end of the week in order to bring it into compliance with the Early Childhood Program furnishing standards.[6]  Appellant did not object to removal of the cabinet, and only asked if she could keep the trays.  Test. Masters and appellant. Mr. Masters answered in the affirmative.  *Id.*  Appellant also asked about a replacement for the cabinet, and Mr. Masters said he would see if he could find a bookcase. Masters test.

On October 10, 2002, Mr. Masters went by appellant's classroom, and told her the metal cabinet would be removed the following morning, and she would be given a bookcase.  Masters test.; Masters' memo, IAF tab 12, subtab 4ii. Appellant reiterated her request to keep the trays, and Mr. Masters said that was not a problem but she needed to have the trays removed from the cabinet before Friday.[7]  *Id.*

On Friday, October 11, 2002, at approximately 6:30 a.m., Mr. Masters asked the supply technician, George Barnhart, if he had removed the metal cabinet from appellant's classroom.  Masters test.; Masters' memo, IAF tab 12, subtab 4ii.  Mr. Barnhart replied that he had put the bookcase in the classroom but had not removed the metal cabinet because the trays were still in it.  Mr.

---

[5]  *See* Agency Exhibit (Ag. Ex.) 2; test. of appellant and Mr. Masters.

[6]  Masters test.; Masters' October 11, 2002, Memorandum for Record (Masters' memo), IAF tab 12, subtab 4ii.  The cabinet is large, bulky, on wheels, and likely to tilt, and; therefore, a safety hazard for elementary students.  Masters test.; Ag. Ex. 2.  Mr. Masters testified, without rebuttal, that at one time there were a lot of these metal cabinets (cubby organizers) in the school but they had all been removed prior to October 11, 2002, except the one in appellant's classroom.

[7]  Appellant admitted Mr. Masters had discussed removing the cubby organizer with her before October 11, 2002, and that on October 10, 2002, he told her the cubby organizer would be removed the next day.  Appellant test.  Appellant stated, however, that Mr. Masters did not specify a time for the removal.  *Id.*

Masters and Mr. Barnhart then went to appellant's classroom, removed the trays from the cabinet and placed them on the bookcase, and Mr. Barnhart then took the metal cabinet out of the classroom. Masters test.; Masters' memo, IAF tab 12, subtab 4ii; Ag. Ex. 5, p. 1. Neither appellant nor the students were present when these events occurred. *Id.*

At approximately 8:15 a.m. on October 11, 2002, Mr. Masters and Mr. Barnhart returned to appellant's classroom to see if she needed any help with the bookcase. Masters test; Masters' memo, IAF tab 12, subtab 4ii. Appellant was video taping one of the students when they arrived. The student was saying something about wanting Mr. Masters to bring the cabinet back, and that they could not find their trays because they were on top of one another. Masters test.; Masters' memo, IAF tab 12, subtab 4ii; Appellant Exhibit (App. Ex.) Z. Mr. Masters asked appellant if she was taping the students, and she replied in the affirmative. App. Ex. Z. Mr. Masters then uttered the phrase "that's quite all right," and told appellant he wished to say something to her but she could not tape him.[8] At this point, appellant turned the video camera off. App. Ex. Z.

---

[8] Mr. Masters testified that he told appellant she should not be taping the students, that he did not say it was all right, and that he did not put his hand over the camera lens. Appellant submitted a video tape containing a couple of minutes of tape showing a student talking in front of the bookcase containing the trays, and then Mr. Masters asking appellant if she was taping the students. When appellant said she was, Mr. Masters stated "that's quite all right," and then, looking toward appellant, "I want to say something to you and you don't tape me." While making this last statement, Mr. Masters put his hand up toward the video camera but did not cover the camera lens with his hand. App. Ex. Z. Appellant contends the snatch of video tape she provided contradicts Mr. Masters' testimony to the effect that he told her she should not be taping the students, and that he did not put his hand over the camera lens. Yet, I find the tape is insufficient to establish these facts. The video tape submitted as evidence appears to be missing segments. Also, it is unclear whether Mr. Masters was saying "that's quite all right" to appellant or to one of the students. Appellant testified that the children were talking to Mr. Masters. Furthermore, the tape shows Mr. Masters telling appellant that he wished to say something to her and looking rather serious. What he said to appellant off camera could just as likely as not have been that he expected her to have gotten parental permission before video taping students. As previously indicated, the video tape shows Mr. Masters putting his hand up but the lens is not "blocked,"

Appellant and Mr. Masters provided somewhat different descriptions of what occurred next, although they agree on a number of points. In his testimony at the hearing and in a memorandum he prepared the day of the incident, Mr. Masters gave the following description of his encounter with appellant the morning of October 11, 2002.[9] Mr. Masters informed appellant that he and George (Barnhart) were there to see if she needed any assistance with the bookcase or anything else.[10] Appellant told Mr. Masters he could have been there, and he reminded her that they had already spoken about the matter, and she knew the cabinet was going to be removed that day. Masters' memo, IAF tab 12, subtab 4ii. Appellant also told Mr. Masters that the bookcase was too small, and she needed something larger. Then, when Mr. Masters said he did not have anything else at the time, appellant became agitated and upset. Mr. Masters suggested that some of the students' supplies could be stored in another shelving unit that was in the classroom; at which point, appellant raised her voice and said words to the effect that the unit he was referencing was hers for her dittos.[11] Mr.

---

inasmuch as you can see Mr. Masters through his fingers. I also noted that although appellant told the deciding official, Douglas S. Kelsey, that she would provide him with a copy of the video she made on October 11, 2002, she never did provide him with a copy of the video tape. Kelsey test.; summary of appellant's oral response to proposed removal at p. 4, IAF tab 11, subtab L.

[9] *See* Masters test.; Masters' memo, IAF tab 12, subtab 4ii.

[10] George Barnhart went over to the bookcase, adjusted one of the shelves holding the trays, and then left the classroom. According to Mr. Barnhart, appellant and Mr. Masters were discussing the decision to replace the "tote tray cart" with a black metal bookcase, and he did not feel the need to involve himself in what transpired between the two of them. Memorandum for Record signed by George A. Barnhart, IAF tab 12, subtab 4ii. Although Mr. Barnhart was approved as a witness for both parties, and seemingly had first-hand knowledge of at least part of what occurred between appellant and Mr. Masters the morning of October 11, 2002, neither party called him to testify at the hearing.

[11] Mr. Masters and appellant were referring to a white plastic shelving unit which appellant claimed was her personal shelf. Masters test.; Masters' memo, IAF tab 12, subtab 4ii; Ag. Ex. 5.

Masters then began to back toward the door in order to leave the classroom and avoid a confrontation with appellant. As he was moving toward the door, appellant loudly stated that the lawyer said she could keep the metal cabinet. When Mr. Masters did not respond and continued to move toward the door, appellant said she would just add this to her case. Mr. Masters responded that he was not aware of any complaint, and she could do whatever she wanted. As Mr. Masters was backing out the door, appellant came from her desk area and moved toward him, shaking her finger in his face and asking loudly if he was trying to threaten her. Mr. Masters told appellant to put her finger down, not to threaten him, and asked her if she wanted him to go.[12] When appellant began talking louder and asking Mr. Masters if he was saying he would get her out of there, he told her that was not what he had said. Appellant loudly stated that he could not get rid of her. Masters test.; Masters' Memo, IAF tab 12, subtab 4ii. At this point, Mr. Masters turned around and left the area. Appellant then pushed the call button for the office and requested "security." *Id.*

Mr. Masters testified that he never raised his voice to appellant, never threatened her, never told her he would fire her, never raised or pointed his finger at her, and never physically touched her.

Appellant admitted Mr. Masters had discussed removing the metal cabinet (large cubby organizer), and that on Thursday he had told her it would be removed on Friday but did not specify a time. App. test. Appellant also testified that removal of the cubby organizer caused problems, as the trays were in a new place and the children did not know where to find their things. According to appellant, when the children came into the classroom on Friday morning, there

---

[12]   Masters test.; Masters' memo, IAF tab 12, subtab 4ii. In view of appellant's interpretation, it is possible that Mr. Masters asked appellant if she wanted him out rather than did she want him to go.

was mass confusion and she was trying to calm the children down. Appellant test.

Appellant testified that she began video taping the scene in her classroom the morning of October 11, 2002, because she was "miffed" about losing the cubby organizer, and wished to document the confusion to show Mr. Masters the problem he had created for the children. Appellant further testified that Mr. Masters then entered the classroom with George Barnhart, and she asked him if he would like to observe what was going on. Appellant stated that Mr. Masters asked her if she was recording the children, and when she said "yes," he said that was OK but you will not record me, so she turned the video camera off.[13] Appellant test.

Appellant testified that Mr. Masters was looking around and talking to the children, and the children were telling him they could not find their things. Appellant further testified that Mr. Masters then told her that he said he was going to do what he was going to do and he did it (referring to the cubby organizer). Appellant also testified that she asked Mr. Masters if he felt the bookcase was a sufficient replacement, and he repeated that he said he was going to do what he was going to do and he did it. Appellant further testified that Mr. Masters was adamant about having the cubby organizer removed and began yelling at her. Appellant additionally testified that she told Mr. Masters he was scaring the children, and that the children should not be hearing this; it was not good. She also told him that all this was not good for an upcoming Federal hearing. Appellant stated that Mr. Masters then asked if she was threatening him, and, with his arm out and his index finger pointing at her,[14] screamed that he would put her out. Appellant testified that Mr. Masters was enraged and, while

---

[13] *See* footnote 7 *supra.*

[14] Appellant referred to Mr. Masters' index finger as a "gun finger."

grinding his teeth and pushing his chest out at her, repeatedly yelled that he would put her out. According to appellant, Mr. Masters then shoved her with his chest and left. Appellant test.; App. Ex. Y.

Appellant testified that after Mr. Masters left, she was crying and saying that he could not do this to her. She further testified that she closed the classroom door and tried to regain her composure so she did not traumatize the children. Appellant also testified that she was trying to maintain some semblance of stability and was wheezing. Appellant additionally testified that she buzzed the office and asked them to please call the security police. Appellant test. According to appellant, she interpreted Mr. Masters' pointed finger and statement "I'll put you out," as a threat to kill her. Appellant test.; App. Ex. Y.

There is little difference in the descriptions of events given by appellant and Mr. Masters on a number of points. Mr. Masters reminded appellant that he had said the cubby organizer was going to be removed and it was removed. Appellant was angry ("miffed") and upset at the loss of the cubby organizer, and felt the substitute bookcase was inadequate. She was also unwilling to free up some space on another shelving unit that was in the classroom to make up for the fact the bookcase was smaller than the cubby organizer. Appellant informed Mr. Masters that a lawyer had told her she could keep the metal cabinet, and that his actions would be described in a complaint or Federal hearing that was pending. Also, Mr. Masters indicated to appellant that he felt she was threatening him.

Mr. Masters and appellant differ, however, in their descriptions of their tone of voice during the incident. Furthermore, I find neither individual entirely credible in this regard.[15] Both individuals indicated that they did not raise their

---

[15] In assessing the credibility of witnesses, the criteria set forth by the Board in *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987) were utilized. These include: (1) The witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability

voices and spoke calmly to each other. Given the situation, I find their testimony in this regard inherently incredible and contradicted by other evidence. Letters written by students in the classroom at the time, and statements made to at least one parent, indicate that both Mr. Masters and appellant had raised their voices.[16] With respect to Mr. Masters, the situation wherein appellant was challenging his decision to remove the organizer from her classroom, video taping students and getting them involved in her dispute, and complaining about the size of the substitute bookcase in front of the students was one which would try the patience of any principal. Also, it is not unusual to raise one's voice when responding to a person who is yelling or speaking to you in a loud voice. As for appellant, she was admittedly angry and upset at the loss of the cubby organizer, and was busy organizing a campaign to have it returned when Mr. Masters walked in and then refused to change his decision. She also seemed concerned over the fact Mr. Masters found her video taping students. In addition, from her statements in the record and her testimony, it appears appellant was having some difficulty organizing her students that morning, and blamed Mr. Masters for the confusion. Under these circumstances, I find it more likely to be true than not that both Mr. Masters and appellant raised their voices during the course of their discussion on October 11, 2002.

Appellant and Mr. Masters also differ in their descriptions of Mr. Masters' behavior. Yet, I find inherently incredible appellant's testimony to the effect that Mr. Masters became "enraged," threatened her, pointed a finger at her, told her he would "put her out," and shoved her with his chest. Mr. Masters is a principal with 24 years of experience in educating children and managing a school. There

---

of the witness's version of events; and (7) the witness's demeanor. *Hillen*, 35 M.S.P.R. at 458.

[16]   IAF tab 10, subtab 4K, pp. 78, 80, tab 12, subtab 4ii, p. 35. Deborah Webster, the mother of one of appellant's students, testified that from her daughter's account of the incident she got the impression that both Mr. Masters and appellant were yelling.

is no evidence, other than appellant's statements to that effect, that Mr. Masters was prone to losing his temper or had ever lost his temper at a teacher in front of students. Just because he may have raised his voice at some point in his discussion with appellant that day does not mean Mr. Masters was "enraged" or so out of control that he would threaten or assault a subordinate teacher, much less in front of third-grade students. Also, if in fact Mr. Masters had become enraged and behaved in a menacing manner toward appellant, the children who were present would likely have expressed some fear for their safety or that of appellant. Yet, there is no such evidence. Mr. Barnhart described the actions of Mr. Masters and appellant as "conversing" about Mr. Masters' decisions regarding the "tote tray cart" and "bookcase." IAF tab 12, subtab 4ii. Letters from students that were present indicate that Mr. Masters "yelled" at appellant, and the students were concerned they might lose appellant as a teacher, but they do not indicate fear for appellant's safety. Furthermore, the students' belief that appellant might be fired could just as likely, if not more likely, have come from the statements of appellant than from anything said by Mr. Masters.[17]

Mr. Masters' testimony regarding having asked appellant if she wanted him to leave (or out) is consistent with his stated purpose for being there in the first place, i.e., to provide appellant with assistance in rearranging her classroom to accommodate loss of the cubby organizer. Also, such an utterance would be in

---

[17] As previously stated, appellant appeared to be quite concerned that Mr. Masters had caught her video taping students. The record reflects that she had not obtained prior permission from parents to video tape her students, although this was a requirement. Appellant went to great lengths to explain her actions, testifying that she used the video camera only because she could not find her still camera, that Mr. Masters had said the video taping was "okay," that she does not recall any instruction not to video tape students, and that the students were on the video tape only because they were at the bookcase when she was filming it. Her testimony in this regard is consistent with Mr. Masters having told her that she should not be video taping students, and her belief that he might fire her for such an action. Appellant had previously received a Letter of Caution from Mr. Masters in connection with her attempt to tape one of their discussions. *See* Ag. Ex. 7.

keeping with a supervisor who had come to an employee's work location to provide assistance, only to be greeted with challenges to his decision and actions that verge on insubordination. Additionally, Mr. Masters' actions following the incident were not those of a principal so "enraged" with the behavior of a teacher that he felt she should be fired immediately. In fact, the record reflects that the only action considered by the administration at that time was to place appellant on administrative leave for one day to cool down.[18]

The tone of his contemporaneous written description of the incident, and his testimony at the hearing, reflect that Mr. Masters was attempting to handle the situation in a calm and reasonable manner. He gave appellant several days notice that the cubby organizer was going to be removed, and then reminded her of the removal the day before it was to take place. He granted appellant's request to keep the trays, and did what he could to find a substitute bookcase. Although the substitute bookcase was not large enough to hold all of the trays in the manner desired by appellant, it was all that was available at the time.[19] Additionally, the morning the cubby organizer was removed, Mr. Masters took Mr. Barnhart with him, and went to appellant's classroom to provide whatever assistance she might need with moving furniture and reorganizing things to accommodate the loss of the cubby organizer. Then, when appellant became agitated, argumentative and loud, Mr. Masters promptly left the premises to avoid further escalation of a bad situation.

Appellant's behavior and actions, on the other hand, were not those of a reasonable person, much less a reasonable teacher with her students' best

---

[18] IAF tab 12, subtab 4ii, p.1. *See also* record of telephone conversation between Deborah Webster and Mr. Masters on Friday, October 11, 2002, wherein Mr. Masters indicated appellant would be in the classroom on October 15, 2002, when the children returned to school, IAF tab 12, subtab 4gg.

[19] *See* Mr. Masters' statement, IAF tab 12, subtab 4ii.

interests at heart. Appellant's testimony and the excerpt of the statement she gave the Guam police,[20] indicate that she was very emotional, clearly upset at the loss of the cubby organizer, and blamed Mr. Masters for her problems. Yet, she did not raise her concerns or discuss the matter with Mr. Masters earlier in the week, when he informed her that the cubby organizer would be removed on Friday. She simply indicated that she wished to keep the trays and asked about a replacement. Appellant also did nothing to prepare her students for the loss of the cubby organizer, and did not remove the trays and place them in another location before Friday, October 11, 2003, the day the cabinet was scheduled to be taken from her classroom.[21] In fact, she was so "miffed" about losing the organizer that instead of assisting her students with finding places for their trays, and facilitating their acceptance of a different arrangement, she let the students know she blamed Mr. Masters for the confusion, and encouraged their describing how they felt about the loss of the cubby organizer on video tape. Then, when Mr. Masters arrived with Mr. Barnhart to provide some assistance, in front of the students, appellant admittedly complained about the size of the substitute bookcase, stated a lawyer had told her she could keep the organizer, and indicated the cabinet removal would be added to a complaint she had pending against Mr. Masters. These are not reasonable actions on the part of a professional teacher.[22]

---

[20] App. Ex. Y. Appellant did not submit her entire statement, and the partial statement submitted does not contain the signature page or the date of preparation.

[21] Appellant admitted Mr. Masters told her the cubby organizer would be removed on Friday, October 11, 2003, but stated he did not tell her the exact time it would be removed. The fact she did not know the exact time the cubby organizer would be removed would seem to be all the more reason for appellant to have had the trays removed before Friday morning.

[22] Appellant should have discussed her concerns about losing the cubby organizer with Mr. Masters when he informed her of his decision earlier in the week. By discussing the matter beforehand in private, they might have been able to work out a reasonable solution to the problem. If appellant still wished to challenge the decision, she could

Thus, it appears appellant was very emotional and not thinking very clearly that day.

I find Mr. Masters' description of their conversation and actions on October 11, 2002, more credible than that of appellant. Both of these individuals were involved in the incident and should be able to describe what occurred. Mr. Masters' testimony at the hearing was direct, straightforward, and when he was not certain of a fact, he so indicated. His statements were consistent with one another and other evidence.[23] Appellant's testimony, on the other hand, was dramatic and somewhat rambling, and many of her statements were inconsistent and contradicted by other evidence. Mr. Masters exhibited no bias toward appellant, and his description of what occurred is fairly consistent with appellant's up to the point where she claims he became enraged and menacing, pointed a finger at her, and said he would put her out. Appellant, on the other hand, exhibited extreme bias against Mr. Masters,[24] and was admittedly very emotional and angry with him on the day in question, casting doubt on her ability to accurately portray the event.[25]

---

have done so through appropriate channels without involving the students in the dispute.

[23] The record reflects that appellant had made threatening remarks, and spoken to a supervisor in a loud, insolent tone and manner, on another occasion. *See* Ag. Ex. 9.

[24] Appellant was unhappy with a number of decisions made by Mr. Masters even before the decision to remove the cubby organizer from her classroom. *See* documents, IAF tab 10, subtab 4K, pp. 40, 69-70, 72, and 76.

[25] *See also* testimony of Dr. Archana Leon-Guerrero (appellant may have over perceived or over valued the incident with Mr. Masters; for a long time prior to the incident on October 11, 2002, appellant had felt her job was in jeopardy; appellant suffers from persecutory ideation; the confrontation with Mr. Masters may have been sufficient to cause appellant to recall an incident with her ex-husband wherein her life was in danger).

I find a preponderance of the credible evidence shows that Mr. Masters' visits to appellant's classroom on October 11, 2002, and their discussions that day, occurred as he related, with the exception that at some point Mr. Masters may have raised his voice.[26] That is not to say, however, that appellant did not perceive that Mr. Masters said he would put her out; only that her perception was inaccurate.

After Mr. Masters left her classroom, appellant called the office on the intercom and requested security. Ms. Norlyn McNulty took the call, and she, Juan Ruiz, and Assistant Principal Sharon K. Hall went to appellant's classroom.[27] When Ms. McNulty opened the door to the classroom, appellant was on the telephone and in tears. Ms. McNulty asked appellant what was wrong, and appellant replied that she was tired of Mr. Masters harassing her, and that he had come into her room and taken something away from her students. Appellant also told Ms. McNulty that she had an exchange with Mr. Masters, and he told her she would be "put out." Appellant repeated this several times. At this point, Ms. Hall entered the room, and observed all but one of the students sitting at tables, silent and looking at appellant. One child was standing at the teacher's desk with an arm around appellant, while appellant was crying hysterically and saying in a loud voice: "That man had no right to do this to me."[28]

Ms. Hall asked appellant to come into the hall with her but appellant slapped her hand down on the computer table, and said she would not leave until the Security Police came and she could make a statement about the whole

---

[26] The fact that an individual's testimony is found not credible regarding one issue does not necessarily mean that his testimony is not credible regarding other issues. *Gill v. Department of Defense*, 92 M.S.P.R. 23, 27 (2002); *Craft v. Department of Veterans Affairs*, 78 M.S.P.R. 374, 380 (1998).

[27] Testimony Sharon Hall; statements Norlyn McNulty and Juan Ruiz, IAF tab 12, subtab 4ii.

[28] Statements of Hall and McNulty, IAF tab 12, subtab 4ii.

incident. When Ms. Hall indicated she did not know what appellant was talking about, and did not understand why she was so upset, appellant began telling her about the conversation she had with Mr. Masters that morning.[29]

While Mr. Ruiz worked with the students, Ms. Hall spoke with appellant in a quiet voice, and tried to calm her down without having the students overhear their conversation. Appellant went on about how Mr. Masters was harassing her, that he was a "mean man," and that she should not have to endure that kind of treatment. Ms. Hall once again tried to get appellant to come outside of the classroom with her, explaining that the children should not be seeing or hearing their exchange. Appellant, however, raised her voice and told Ms. Hall that "this is reality," and the children needed to be aware of reality. Appellant made a number of accusations against Mr. Masters, and spoke at great length about how badly she believed Mr. Masters treated her, and how he had said in loud voice that he would "put (her) out." When Ms. Hall asked appellant what she meant by "put out," appellant replied: "Put me out of this school."[30]

By this point, appellant was calming down. She was speaking in a lower voice and no longer had tears streaming down her face. A child came up and handed appellant a note, which Ms. Hall read at the same time as appellant. Ms. Hall then inquired of appellant if she had asked the children to respond in writing to the conversation between herself and Mr. Masters. According to Ms. Hall, appellant stated, "No, I did not, as God is my witness, I did not Ms. Hall." "This is all the kids doing." Ms. Hall then informed appellant that they must never involve the children in anything between two adults at the school.[31]

---

[29]  Hall test. and statements of Hall and Ruiz, IAF tab 12, subtab 4ii.

[30]  Hall test. and statement, IAF tab 12, subtab 4ii.

[31]  *Id.*

Ms. Hall offered to assist appellant in making the classroom more manageable for herself and the children, and to find a place in the school to hold some of the boxes until additional shelving could be located. Ms. Hall also offered to send another third-grade teacher to attend, in appellant's place, two Individual Education Plan (IEP) meetings that were scheduled for 9:00 a.m. and 10:00 a.m. that morning.[32] Additionally, Ms. Hall offered to have appellant see the nurse. Appellant, however, declined the offers of assistance and, upon the arrival of the substitute teacher, left her classroom to attend the IEP meetings.[33]

Appellant's description of her conversation with Ms. Hall that morning is slightly different.[34] In a written statement given to the Guam police, appellant said she told Ms. Hall that Mr. Masters had threatened her life, and that Ms. Hall had "cut (her) short" and said "she didn't want to talk about Masters." App. Ex. Y. Appellant also stated that she knew then that there was going to be a cover up, and that Ms. Hall did not want to deal with the traumatic situation. Appellant further stated that she was crying uncontrollably, found it difficult to speak, and while she tried to gain her composure, Ms. Hall just sat there and stared at her. *Id.* Appellant additionally stated that Mrs. Hall ordered her not to talk to the children about the "traumatic incident," did not call the nurse, insisted she attend two IEP meetings for two of her Special Education students, and that Mrs. Hall did not attend the meetings because she was "busy doing 'damage control'." App. Ex. Y.

Ms. Hall testified at the hearing that appellant did not tell her Mr. Masters had threatened her life; she said he had come into her personal space, and he had

---

[32] An IEP is something which is done for the special education children in the school. Hall test. The scheduled IEP meetings were for two of appellant's special education students. Test. Hall and appellant.

[33] Hall statement, IAF tab 12, subtab 4ii.

[34] Appellant statement, App. Ex. Y, and testimony.

no right to get in her personal space. Ms. Hall also testified that she never said she did not want to talk about Mr. Masters, and she never ordered appellant not to talk to the children. Ms. Hall further testified that she did not refuse to attend the IEP meetings; she was not scheduled for these meetings and there was no reason for her to be there.

I found Ms. Hall's version of events more credible than that of appellant. As previously stated, I did not find appellant to be a credible witness. At the hearing, her demeanor was emotional and her testimony frequently rambling and full of extraneous information. Her testimony and statements show that she was very upset and angry that a decision was made concerning her classroom of which she did not approve, and Mr. Masters would not change the decision. She was so focussed on what she perceived as harassment and injustice on the part of the principal and the school administration that she did not relate facts in an objective unbiased manner.

In the statement she gave the Guam police, appellant exaggerated certain facts and made a number of assumptions. App. Ex. Y. Appellant stated that after removal of the cubby organizer, the children's trays were "jammed into a small, black, rickety, metal bookshelf, causing objects to fall out onto the floor and into other student trays." Yet, the excerpt of video tape and the pictures submitted do not reflect a "rickety" bookcase or that objects had or could fall out of the trays onto the floor or into other trays. *See* App. Ex. Z; Ag. Ex. 5. Appellant also described Ms. Hall's expression when she entered the classroom as she "looked as if she needed to go to the hospital," intimated that Ms. Hall would participate in a "cover up," and stated that Ms. Hall did not want "to deal with this traumatic situation." Additionally, appellant indicated she did not want the children to see her so upset. Yet, appellant admittedly refused to leave the classroom, and sat at her desk crying hysterically to the point where a student felt it necessary to comfort her by putting an arm around her and resting her head on appellant's

shoulder. Thus, I found appellant's version of what occurred to be somewhat suspect.

Ms. Hall, on the other hand, testified in a detailed, straightforward, and factual manner. Furthermore, her testimony was consistent with a statement she prepared contemporaneously with the event, and the statements of two individuals who were present when she arrived at appellant's classroom, Mr. Ruiz and Ms. McNulty. IAF tab 12, subtab 4ii. Ms. Hall showed no bias against appellant, and had no real reason to fabricate or edit what appellant had said to her. Furthermore, her description of the actions she took, and the offers of assistance she made, are consistent with other evidence, and with what one would reasonably expect from a supervisor and school administrator under the circumstances. Accordingly, I found her description of what occurred more accurate than that of appellant.

It is undisputed that after attending the two IEP meetings, appellant returned to her classroom and dismissed the students at approximately 11:15 a.m. As October 11, 2002, was a Staff Development Program day, after dismissal of the students, the teachers were given approximately one hour for lunch, and then required to spend the afternoon in staff development.

It is undisputed that appellant was not seen at lunch on October 11, 2002, did not attend the Staff Development Program, left the school an hour or more before the end of her tour of duty, and did not sign out before she left. *See* App. test.; Sign Out Record, IAF tab 12, subtab 4hh. It is also undisputed that appellant was absent from work on October 15, 2003, and every work day thereafter until February 18, 2003. *Id.*

Appellant was placed on administrative leave on October 16, 2002, and remained on administrative leave and sick leave[35] until January 6, 2003. Test.

---

[35] Appellant was granted sick leave for December 5 and 6, 2002. Test. Susan Burdick; Ag. Ex. 10.

Susan Burdick. Assistant Superintendent Susan Burdick testified that appellant was placed on administrative leave to give her time to cool down and the administration time to sort through the situation. Dr. Burdick explained that the school had received a number of parental complaints regarding appellant's behavior, and there were some issues regarding her being absent without leave.

On October 16, 2002, Mr. Masters sent appellant a memorandum dated October 15, 2002, informing her that because she left her place of duty on October 11, 2002, without properly requesting leave, she was considered absent without leave (AWOL) from 1:20 p.m. until the end of the duty day. IAF tab 12, subtab 4ff. The memorandum also noted that appellant had not reported for duty on October 15, 2002, and had failed to call in and request leave or properly notify management, and informed her that she was considered AWOL for the entire workday on October 15, 2002. *Id.* In the memorandum, Mr. Masters also advised appellant that he and Ms. Hall had received complaints from parents who were upset about certain of appellant's actions and behavior. Appellant was told that effective Wednesday, October 16, 2002, she was on administrative leave with pay, at her home residence, until further notice. *Id.* Appellant was also told that she must be available at her home during the duty day, except for the lunch period from 12:00-12:30 p.m., in the event he needed to contact her. Additionally, the memorandum instructed appellant that she was not to be on Andersen Elementary School premises for any purpose, at any time, and was not to be on any DODEA, DDESS school/district office site on Guam until further notice. *Id.*

Two copies of the October 15th memorandum were sent to appellant by certified mail, return receipt requested, to the addresses the school had on file for her, and one copy was sent by DHL delivery to the address the Personnel Office had on file for appellant. Hall test.; IAF tab 12, subtab 4ff. None of the copies of the memorandum reached appellant. The two copies that were sent by certified

mail were unclaimed and returned to the school,[36] and the copy sent by DHL delivery was returned with the indication that no one with appellant's name lived in the apartment complex to which it was addressed. Hall test.; IAF tab 12, subtab 4ee.

On October 16, 2002, appellant telephoned the school office at approximately 8:30 a.m., and told the school secretary, Mrs. Johnson, that she would not be at work for the rest of the week. Hall test. When Mrs. Johnson asked her for an address and telephone number where she could be reached, appellant refused to give an address but provided a telephone number. When Ms. Hall attempted to call appellant, using the telephone number appellant had given Mrs. Johnson, a man answered the telephone and told Ms. Hall that appellant was not staying there and he did not know where she was.[37] Hall test.

On October 18, 2002, at approximately 9:00 a.m., another teacher, Elizabeth Flores, dropped off report cards for appellant's students for Administrator approval. *See* memorandum for record by Mahrae L. Meek, IAF tab 12, subtab 4dd. Later that morning, Ms. Flores was told that appellant needed to contact Mr. Masters and speak with him directly regarding her request for medical leave. Memorandum by Carrie Oliver, IAF tab 12, subtab 4dd. Mr. Masters also telephoned appellant, and left a message on the answering machine for appellant to contact him or Ms. Hall. IAF tab 12, subtab 4dd.

---

[36] Appellant testified that the letters went unclaimed because she never picked them up. She further testified that she was sick for a while and did not pick up her mail.

[37] Appellant testified that she gave the school her brother's telephone number as an emergency contact, and that the school never attempted to contact her through her brother. According to appellant, her brother never said anyone called from DODEA (Department of Defense Education Activity). Yet, the fact appellant's brother may not have told appellant that someone from the school called does not mean Ms. Hall did not call. Furthermore, appellant's statement is uncorroborated. The record does not contain a statement or testimony from appellant's brother.

On October 31, 2002, the school received a "Request for Leave or Approved Absence" signed by appellant on October 17, 2002, in which she requested Family Medical Leave Act (FMLA) or Workmen's Compensation leave for the period October 15, 2002, to November 1, 2002, for "illness/injury/incapacitation ... ." Ag. Ex. 6; Hall test. Accompanying the leave request was a medical certificate dated October 16, 2003, signed by Debra G. Ericson, M.D., stating that appellant should be "off work" from October 15 through October 18, and from October 21 through October 25 for "asthma, situational anxiety, and depression." *Id.* There was also a medical certificate signed by Vincent Duenas, M.D., and dated October 23, 2002, excusing appellant from work for the period October 28, 2002, to November 1, 2002, for "stress reaction." *Id.* Subsequently, on November 1, 2002, Ms. Hall received a one page facsimile from appellant asking that she accept her sick leave excuse. IAF tab 11, subtab 4bb. Included on the facsimile was a medical certificate from Debra Ericson, M.D., stating that appellant needed "extended work leave due to insomnia, asthma, stress reaction." *Id.*

On November 7, 2002, appellant telephoned Ms. Hall to ask if leave had been approved. Hall test. Ms. Hall advised appellant that she was on paid administrative leave, and she did not need sick leave or medical certificates. Ms. Hall then asked appellant if she had received the memorandum placing her on administrative leave, and appellant said she had not. Ms. Hall offered to send her the memorandum but appellant would not provide an address. Hall test. During this conversation, Ms. Hall told appellant that she must not use Ms. Flores as a go-between because school officials needed to speak to her directly in order to keep the channels clear and not have things misconstrued or misinterpreted. *Id.*

Ms. Hall received another telephone call from appellant on November 12, 2002, wherein appellant expressed concern regarding her leave and pay status. Hall test. Once again Ms. Hall told appellant that she was on administrative leave, and she was being paid. *Id.* During this conversation, Ms. Hall also told

appellant that the school was contacted by parents asking about books they had ordered in September and had not received. Appellant told Ms. Hall that she had the books at her home. Test. Hall and appellant; Hall memorandum for record, IAF tab 11, subtab 4aa. When Ms. Hall asked appellant if she would bring the books to the school, appellant told her that she would not come to the school because Mr. Masters was there, and she had a temporary restraining order against him.[38] Hall test. Appellant also informed Ms. Hall that she was ill. Test. Hall and appellant. Ms. Hall then offered to send "George and John" to her home to pick the books up, but appellant refused to give an address. *Id.* At this point, Ms. Hall told appellant to bring the books to the front gate of Andersen Air Force Base, and either she (Ms. Hall), George or John would pick the books up there. Hall test.; memorandum for record, IAF tab 11, subtab 4aa. According to Ms. Hall, appellant agreed to this procedure.[39] *Id.*

On November 19, 2002, appellant sent a facsimile message to Dr. Richard Tom, Superintendent, requesting a copy of the memorandum placing her on

---

[38] On October 31, 2002, appellant, through the Guam Legal Services Corporation, filed a complaint in the Superior Court of Guam seeking a temporary and permanent injunction against Principal Joseph Masters. The United States Attorney intervened in the matter, and had the case removed to United States District Court where it was pending during the course of this proceeding. IAF tab 11, subtab 4cc.

[39] Appellant testified at the hearing that she told Ms. Hall she was taking medication that made her drowsy, and that she had trouble grasping the wheel and could not drive. Appellant's testimony regarding the medication is supported by that of Dr. Debra Ericson (some of the medications I prescribed for appellant may have caused drowsiness). Ms. Hall, however, testified that appellant said nothing about her medicine; she simply said "you know I am ill." Ms. Hall also testified that she knew appellant was ill but did not know the nature of the illness. Ms. Hall further testified that she knew appellant was asthmatic; appellant had told her this previously but not around the events in question. Ms. Hall's testimony in this regard is contradicted by the evidence showing that appellant submitted a leave request and medical certificates stating that she was ill and in need of leave for asthma, situational anxiety, depression, and stress reaction, and that the packet containing this information was received by school administrators at Andersen Elementary School on October 31, 2002. Ag. Ex. 6; Hall test. (recalls seeing the leave request; the packet was received October 31, 2002).

administrative leave and providing a current address and telephone number.[40] IAF tab 11, subtab Z. Appellant also requested written confirmation that did not have to prepare lesson plans while she was on administrative leave. *Id.*

At the beginning of December, the agency elected to use Guam DDESS Assistant Superintendent, Dr. Susan Burdick, as the contact person for all employment-related matters with appellant.[41] Burdick test. Dr. Burdick telephoned appellant on December 2, 2002, and asked her to come in for a meeting. *Id.* Appellant said she had a doctor's appointment that day, and could not say when she would be able to meet with Dr. Burdick. Appellant told Dr. Burdick that she would get back to her, and then later telephoned to say she could not make it in that day. Burdick test. On Tuesday, December 3, 2002, Dr. Burdick once again telephoned appellant in an effort to have her come in for a meeting but appellant said she did not feel very well, she had asthma, and she would call her. Burdick test. Appellant then called back and told the secretary she would not be in, and Dr. Burdick was not to call her again. Burdick test.; memorandum prepared by Carrie Olivar and dated December 5, 2002, IAF tab 11, subtab Y. Dr. Burdick telephoned appellant again on Thursday, December 5, 2002, in another attempt to get appellant to meet with her. Appellant told Dr. Burdick that she was sick and could not come in. Dr. Burdick advised appellant

---

[40] Appellant claimed to have given the address previously to Ms. Hall and to Ms. Carrie Olivar, school clerk. Her statements in this regard, however, are uncorroborated and contradicted by the testimony of Ms. Hall and Assistant Superintendent Susan E. Burdick. Ms. Hall testified that when she asked appellant for a current address, appellant declined to give her one, and Ms. Burdick testified that until they received appellant's facsimile on November 19, 2002, they had no current address or telephone number for appellant, and no written designation of a representative.

[41] Dr. Burdick testified that the agency was going to initiate a disciplinary action against appellant, and it would be inappropriate for either Mr. Masters or Ms. Hall to initiate discipline because appellant had filed Equal Employment Opportunity (EEO) complaints against each of them. Dr. Burdick further testified that such an arrangement also meant that appellant did not have to contact Mr. Masters or Ms. Hall at all.

that she was on administrative leave and she would have to come in or her pay status would be changed to AWOL. [42]   Burdick test.   Appellant then sent a facsimile to Ms. Hall criticizing the actions of school administrators, claiming the continuing stress had aggravated her asthma condition, and asking to be left in peace to heal.   IAF tab 11, subtab Y.   Along with the facsimile message, appellant submitted a request for sick leave for December 5 and 6, 2002. *Id.* The sick leave request was granted. Burdick test.

The Guam School District was closed from December 9 through December 20, 2002, due to a typhoon, and appellant was given paid administrative leave. From December 20, 2002, through January 5, 2003, the schools were closed for the holiday break. Burdick test.

On January 6, 2003, at approximately 7:30 a.m., appellant called the Andersen Elementary School office, and told Norlyn McNulty, Office Support Assistant, that she was calling in sick for that day, the rest of the week, and the next week also, i.e., January 6-17, 2003. IAF tab 11, subtab X; Burdick test. Appellant asked for administrative leave.   *Id.*   Following this telephone call, administration officials informed appellant that administrative leave for illness could not be verified, and the school needed proper medical documentation to establish incapacitation.   Burdick test.   Subsequently, on January 13, 2003, appellant submitted by facsimile the following documents: (1) A statement dated January 9, 2003, requesting that all agency signed leave forms since October 15, 2002, be mailed via certified mail to "PO Box 10482, Tamuning, Guam, 96931" or given to Ms. Elizabeth Flores, her chosen representative; (2) a medical certificate from Debra Ericson, M.D., dated January 10, 2003, justifying appellant's absence from work for the period January 3, 2003, through February 14, 2003, for "severe asthma," and "severe stress reaction;" (3) a Standard Form

---

[42]   Appellant felt that Dr. Burdick was threatening and harassing her.  Facsimile from appellant to Ms. Hall dated December 5, 2002, IAF tab 11, subtab Y.

71 (SF-71) Request for Leave or Approved Absence, signed by appellant on January 9, 2003, requesting administrative leave for the period December 5-20, 2002, for "asthma flare, severe stress reaction, and Super Typhoon Pongsoria;." and (4) a SF-71 signed by appellant on January 9, 2003, requesting administrative leave and/or "Workman's Compensation" for the period January 6, 2003, through February 14, 2003, due to "severe asthma, severe stress reaction." IAF tab 11, subtab W; Burdick test. After receiving this information, Assistant Superintendent Burdick, on the advice of agency counsel, wrote appellant a letter dated January 14, 2003, reviewing what had transpired since the incident on October 11, 2002, and clarifying the agency's expectations and requirements. IAF tab 11, subtab V.

By letter dated January 14, 2003, appellant was informed that: (1) Her "Point of Contact" for all employment-related matters was Dr. Burdick or Mr. Gordon Harmon, Human Resource Office (HRO) Site Manager; (2) she must provide Dr. Burdick with a written designation of her official representative for all employment-related matters; (3) her sick leave request for December 5-6, 2002, was approved; (4) her request for administrative leave for the period December 9-20, 2002, was approved because of the typhoon, (5) her request for administrative leave for the period January 6th through February 14, 2003, was disapproved; (6) the medical documentation she submitted (dated January 10, 2003) simply indicated she was under a doctor's care for severe asthma and severe stress reaction, and was insufficient to establish that she was incapacitated for work and eligible for sick leave; (7) she was being placed in an "absent without leave" non-pay status effective January 6, 2003, and she could have her status changed by providing appropriate medical documentation sufficient to allow for the granting of sick leave or leave without pay; and (8) continuing AWOL could form the basis for a disciplinary action. IAF tab 11, subtab V. Attached to the letter was a list of requirements to establish an incapacitating medical condition, a designation of representative form, a position description for

appellant's position which she could give to her physician, and a Worker's Compensation Claim Form. *Id.* The letter was given to appellant's designated representative, Elizabeth Flores, on January 17, 2003, for delivery to appellant. IAF tab 11, subtab V. Appellant received the letter from Ms. Flores on January 20, 2003. Appellant test.

On January 28, 2003, appellant sent Superintendent Richard Tom a facsimile cover sheet asking him to accept an attached "Attending Physician's Report," and informing him that her asthma condition was aggravated by telephonic harassment on the part of Dr. Susan Burdick on December 5, 2002. IAF tab 11, subtab U. On the cover sheet, appellant also stated that she is receiving medication therapy for her asthma condition, and she needs time off work for the medication to be fully effective. She indicated that her doctor felt she should be able to return to work by February 17, 2003, as long as there were no complications. Appellant then went on to describe how she perceived, and felt about, certain actions of Dr. Susan Burdick, Joseph Masters, George Barnhart and Sharon Hall. IAF tab 11, subtab U. The "Attending Physician's Report" attached to the cover sheet was signed by Dr. Ericson, dated January 27, 2003, and indicated that appellant had a pre-existing asthma (reactive airway disease) condition, that she showed "persistent coughing/wheezing over multiple office visits," and that her diagnosed condition was reactive airway disease and situational stress (post traumatic stress disorder). *Id.* Dr. Ericson stated that appellant was receiving office management of her asthma, and was also being seen and treated by a psychiatrist, Dr. Archana Leon Guerrero. *Id.*

On January 9, 2003, appellant sent, by facsimile, to Superintendent Tom a Department of Labor, Office of Workers' Compensation Programs, Form CA-1 "Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation," with the employee portion completed and signed by appellant on January 20, 2003, a witness statement completed and signed by Elizabeth Flores on January 27, 2003, and the supervisor's report portion blank

for completion by the agency. IAF tab 11, subtab T. On the form, appellant described the nature of her injury as "severe anxiety, fear, stress reaction, severe asthma flare-up (brain, heart, lungs)," and the cause as Mr. Masters having "terrorized and assaulted (her) threatening (her) life." *Id.* Subsequently, on February 13 (telephonic) and February 14, 2003, (written), appellant withdrew her Office of Workers' Compensation Programs claim. IAF tab 11, subtab Q.

Appellant reported for work on February 18, 2003, and was told to report to the District Superintendent's Office (DSO). IAF tab 11, subtab P. At the DSO, appellant, and a friend, met with Dr. Burdick and Mr. Harmon. IAF tab 11, subtab N. During this meeting, appellant was presented with a memorandum proposing to remove her from Federal service based on charges of (1) absence without leave (AWOL), (2) disorderly conduct, and (3) failure to follow instructions.[43] IAF tab 11, subtabs M, N and O; Burdick test. Effective February 18, 2003, appellant was placed on paid administrative leave pending a final decision in her case. Burdick test.; IAF tab 11, subtab P.

Appellant responded to the charges both orally and in writing. IAF tab 10, subtabs J and K; tab 11, subtab L.

The deciding official was Acting Superintendent Doug Kelsey.[44] By memorandum dated May 8, 2003, Mr. Kelsey notified appellant of his decision to sustain all three charges, and to remove her from Federal service. IAF tab 10, subtab F. As the May 8th memorandum contained an erroneous effective date,

---

[43] Upon receiving the notice of proposed removal, appellant pointed out that she was not getting paid, despite having had two doctors corroborate her condition, and that she had asked for administrative leave because Mr. Masters was the cause of her injury. IAF tab 11, subtab N.

[44] Mr. Kelsey testified that he is the Deputy Director for Eduction for DODDS schools, and that, in addition, he became Acting Superintendent of DODEA schools in Guam on February 27, 2003.