appellant was issued another memorandum, dated May 12, 2003, which informed her that her removal would be effective at midnight on May 16, 2003.

Appellant was removed from her position, and her employment terminated, on May 17, 2003. IAF tab 10, subtab B. She appealed her removal to the Board alleging the agency committed harmful error by failing to comply with its regulations and the labor agreement, discriminated against her on the bases of her race (Chamorro), color (brown), ethnicity (Chamorro/Hispanic) and sex (sexual harassment), and retaliated against her for having filed EEO complaints. IAF tabs 1, 16 and 26.

## Legal Standard

In an adverse action case, the agency has the burden of establishing by a preponderance of the evidence that the appellant engaged in the charged conduct. 5 U.S.C. § 7701(c)(1)(B); *Pope v. United States Postal Service*, 114 F.3d 1144, 1147 (Fed. Cir. 1997). The agency must also establish a nexus between the conduct and the efficiency of the service. 5 U.S.C. § 7513(a); *Pope v. United States Postal Service*, 114 F.3d at 1147; *Hayes v. Department of the Navy*, 727 F.2d 1535, 1539 (Fed. Cir. 1984). In addition, the agency must demonstrate that the penalty imposed for the proven misconduct is reasonable. *Pope v. United States Postal Service*, 114 F.3d at 1147; *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 306-307 (1981).

The appellant has the burden of establishing her affirmative defenses by a preponderance of the evidence. 5 C.F.R. § 1201.56(a)(2)(iii).

## The agency established its charges.

### Charge 1: Absence without leave

The agency charged appellant with being absent without leave (AWOL) on October 11 and 15, 2002, and from January 6, 2003, to February 18, 2003.

To support its charge of AWOL, the agency must show that the appellant was absent and the absence was not authorized or that a request for leave was

properly denied. *See Taylor v. Department of the Air Force*, 80 M.S.P.R. 450, 454 (1998); *Cooke v. United States Postal Service*, 67 M.S.P.R. 401, 404. (1995), *aff'd*, 73 F.3d 380 (Fed. Cir. 1995) (Table).

An agency may grant sick leave only when supported by administratively acceptable evidence. 5 C.F.R. § 630.403; *Lawley v. Department of the Treasury*, 84 M.S.P.R. 253, 262 (1999). A charge of AWOL will not be sustained if the employee presents evidence to the Board that was not previously presented to the agency showing that the employee was incapacitated for duty during the relevant time period. *Wesley v. U.S. Postal Service*, MSPB Docket No. NY-0752-02-0150-I-1, slip op. at 11 (Sept. 16, 2003); *Young v. U.S. Postal Service*, 79 M.S.P.R. 25, 32 (1998). If an employee has sufficient sick leave to cover the period in question, the agency must grant a request for leave when the employee provides administratively acceptable evidence of incapacitation because of illness or injury, regardless of whether the employee has complied with applicable leave procedures. *Id.*

Appellant's hours of duty on October 11, 2002, were from 7:30 a.m. to 3:00 p.m. Appellant admits she had left the school by at least 2:00 p.m. on October 11, 2002, she did not sign out before she left, and was not given leave for this absence.[45] App. test.; Sign Out Record, IAF tab 12, subtab 4hh. She also

---

[45] Under school policy, teachers must be in school from 7:30 a.m. to 3:00 p.m. each school day. IAF tab 12, subtab 4tt. Appellant testified that she left the school at 2:00 p.m. Another teacher and a friend of appellant's, Elizabeth Flores, testified that she was in appellant's classroom with appellant from 11:30 a.m. to 2:00 or 2:15 p.m., on October 11, 2002, and that they left together. Ms. Flores also testified that the lights were on and the door was unlocked. Her testimony in this regard contradicts appellant's statements that she and Ms. Flores stayed in her classroom with the lights off and the door locked because she feared Mr. Masters would return. *See* Appellant written response to notice of proposed removal, IAF tab 11, subtab L. The testimony of both appellant and Ms. Flores was contradicted by the testimony of Deana Price. Ms. Price testified that she was on a break, standing outside the school next to the emergency exit door at the Child Development Center smoking, when, at 1:40 p.m., she observed appellant come around the corner of the building, walk to her vehicle (a white truck), and drive up the driveway. Furthermore, Ms. Price's testimony is supported by

admits to being absent from work on October 15, 2002, and that she did not call in and was not given leave for that day. *Id.* Additionally, appellant admits that she was absent from work from January 6, through February 14, 2003, and stated that she returned to work on February 18, 2003. App. test. Accordingly, I find the agency has established that appellant was absent from work in excess of 1 hour on October 11, 2002, for the entire work day on October 15, 2002, and for the entire period from January 6, 2003, through February 14, 2003.[46]

It is undisputed and established by the record that appellant was not granted leave for her absences on October 11 and 15, 2002, and January 6, 2003, through February 14, 2003.

Appellant stated that her absences on the dates in question resulted from having been severely traumatized by the actions of Mr. Masters on October 11, 2002. Appellant further stated that she felt the safest place for her was at home. Appellant also claims that the trauma she experienced aggravated her asthma and caused her to be unable to work. App. test. and oral and written response to notice of proposed removal; IAF tab 11, subtab L.

I find appellant's absence for more than one hour on October 11, 2002, was unjustified, and the agency properly charged her with being AWOL. Appellant did not notify her supervisor or any other school official that she was leaving early that day. She also did not request, and was not granted, permission to leave early. Nor does the evidence establish incapacitation. Although appellant was clearly upset and behaving in an unusual and irrational manner on October 11, 2002, the evidence does not show that she was incapable of speaking with her supervisor, Sharon Hall, and asking to be excused from attending the Staff

---

the statement of Cynthia Donaldson, who saw that appellant's truck was not in the parking lot at approximately 1:50 p.m. on October 11, 2002. IAF tab 12, subtab 4ii. I find a preponderance of the credible evidence establishes that appellant left the school's premises at approximately 1:40 p.m. on October 11, 2002.

[46] February 17, 2003, was President's Day, a Federal holiday.

Development Program and from completing her duty shift. Appellant turned down Ms. Hall's offers to see the school nurse and to have someone else attend the IEP meetings in her place. Instead, appellant attended the IEP meetings, and after completion of the meetings, returned to her classroom and dismissed her students. Appellant also telephoned the security police at 11:22 AM, and then spoke with them when they arrived in response to her call.[47] Appellant also had the assistance of Elizabeth Flores the afternoon of October 11, 2002. Under these circumstances, I find the agency properly marked appellant AWOL for her actions in leaving the school premises on October 11, 2002, without permission, approximately one hour and twenty minutes before the end of her duty shift.[48] The agency's first specification of AWOL covering 1 hour and 20 minutes on October 11, 2002, is sustained. *See, e.g., Taylor v. Department of the Air Force,* 80 M.S.P.R. 450, 455 (1998) (Appellant failed to demonstrate that a ½ hour absence was justified.).

On October 31, 2002, appellant submitted a request for leave for her absence on October 15, 2002, along with a medical certificate from Dr. Debra G. Ericson, dated October 16, 2002, stating that appellant should be off work from October 15, 2002, though October 18, 2002, and from October 21, 2002, through October 25, 2002, for "asthma, situational anxiety, and depression." Ag. Ex. 6. When appellant telephoned Ms. Hall on November 7, 2002, to inquire whether her requests for leave were approved, Ms. Hall informed her that she was on paid administrative leave and did not need sick leave or medical certificates. Hall test. At the hearing, Dr. Ericson testified that appellant telephoned her on October 15,

---

[47] *See* page from Security Forces Control Center Blotter for October 11, 2002, IAF tab 12, 4ii, page 6.

[48] *See* 5 C.F.R. § 630.403; *Lawley v. Department of the Treasury,* 84 M.S.P.R. 253, 262 (1999) (An agency may grant sick leave only when supported by administratively acceptable evidence.).

2002, requesting an inhaler, and that when she saw appellant on October 16, 2002, she was tearful and in emotional distress. Dr. Ericson further testified that although she did not observe appellant wheezing on October 16, 2002, appellant was complaining of asthma and emotional distress, and asked to see a counselor. Ericson test. Dr. Ericson referred appellant to psychiatrist, Dr. Archana Leon-Guerrero. *Id.*

Dr. Leon-Guerrero testified that she first saw appellant on October 23, 2002, and that appellant reported she had been assaulted by the principal of the school where she is a teacher and ever since that day she did not feel safe at work or at home. Dr. Leon-Guerrero also stated that appellant reported experiencing symptoms of nausea, crying, insomnia, decreased appetite, nightmares, and flashbacks ever since the incident. At that time, Dr. Leon-Guerrero diagnosed appellant as suffering from "acute stress disorder." Dr. Leon-Guerrero additionally testified that she saw appellant again on October 25 and 29, 2002, and found appellant's condition had not improved. She was more tearful, and she was still unable to eat or sleep properly. Dr. Leon-Guerrero also found appellant suffered from persecutory ideation.

I find a preponderance of the evidence shows that appellant was suffering from incapacitating medical conditions—acute stress disorder and asthma—on October 15, 2002, which required medical treatment. I further find that medical professionals who treated appellant shortly after October 15, 2002, confirmed her incapacitation on October 15, 2002. I also find that appellant had unused leave available on that day.[49] As appellant was incapacitated by illness on October 15, 2002, and had provided the agency with a medical certificate evidencing her need for leave on that date, I find the agency's denial of her request for leave was

---

[49] *See* Declaration of Pauline F. Barcinas (Appellant had a sick leave balance of 100 hours.), Ag. Ex. 10.

improper.[50] The agency's second specification of AWOL covering October 15, 2002, is not sustained.

Appellant contends that she was ill and unable to work during the period January 6, 2003, through February 14, 2003. On January 13, 2003, appellant submitted to the agency requests for leave for the period January 6, 2003, through January 14, 2003, for "severe asthma" and "severe stress reaction." The agency advised appellant that she had not provided sufficient medical documentation to establish incapacitation, and advised her of what she need to submit to justify the granting of sick leave or leave without pay. IAF tab 11, subtab V. Appellant was asked to provide the following information regarding her medical conditions:

    a. History and onset of illness.
    b. A detailed description of your work situation and identification of the specific work factors contributing to your physical condition, including specific restrictions which should be observed.
    c. A review of any non-industrial physical situations.
    d. Results of physical examination, with pertinent findings.
    e. Results of testing, if any.
    f. Diagnosis.
    g. Clinical course of treatment being followed, if any.
    h. Prognosis with any estimate of whether condition is stable or likely to improve or decline in the near future.
    i. Physician's opinion, as to whether, how and which factors of your employment causes, aggravates, precipitates, or accelerates your condition.
    j. An assessment of your current condition, with specific details on how you can or cannot function in daily activities, including a discussion of any limitations you may have which may affect your work capacity.
    k. Identification of whether condition and resulting limitations/restrictions are permanent or temporary arid (sic), if temporary, when the limitations/restrictions may be lifted.
    l. Any other pertinent medical information which should be

---

[50] The fact that appellant had requested a type of leave to which she may not have been entitled—i.e., FMLA leave or Workman's Compensation—does not excuse the agency's denial of her request. The agency was aware that appellant was claiming her absence was due to illness and should have granted her sick leave.

> considered by the Federal Medical Officer in arriving at a
> determination of your ability to perform the duties of your
> position.

IAF tab 11, subtab V, p. 15. Appellant did not provide all of the medical information requested by the agency. Rather, in addition to the medical certificates she had previously submitted, appellant provided the agency with an Attending Physician's Report on a Department of Labor, OWCP form, signed by Dr. Ericson, indicating that appellant was injured on October 11, 2002, during the incident with Mr. Masters, that she had a pre-existing medical condition of asthma (reactive airway disease), that she had symptoms of "persistent coughing/wheezing over multiple office visits," that appellant's current diagnosis was reactive airway disease and situational stress (Post Traumatic Stress Disorder), that she was being treated with office management of the asthma, and being seen and treated for the stress condition (Post Traumatic Stress Disorder) by Dr. Archana Leon Guerrero, a psychiatrist. IAF tab 11, subtabs L and U. Dr. Ericson indicated that she was seeing appellant on a regular basis, that appellant was incapacitated for duty from October 16, 2002, through February 14, 2003, and that she could return to her regular duties on February 17, 2003. *Id.* The agency found this information insufficient, denied appellant's requests for leave, and marked her AWOL.

Appellant had 100 hours of sick leave available to her at the beginning of the school year. Ag. Ex. 10. She used 16 hours in December 2002 and, as discussed above, another 8 hours on October 15, 2002. Thus, at the beginning of January 2003, appellant had 76 hours (9½ days) of sick leave available to cover absences totaling 29 days.[51]

Dr. Burdick testified that the medical certificate signed by Dr. Ericson and dated January 10, 2003, was sufficient for 3-4 days absence but not for an

---

[51] This assumes that January 20, 2003 (Martin Luther King, Jr., Day) and February 17, 2003 (Presidents' Day) were holidays for DODDS teachers.

extended period because of a lack of specificity, and because there was no prognosis. Dr. Burdick gave no reasonable explanation for why the agency did not find the Attending Physician's Report prepared by Dr. Ericson sufficient to justify the extended leave appellant had requested. She simply stated that the Attending Physician's Report was sent back to agency counsel for preparation of a supervisor's response to appellant's OWCP claim. Then, when the documents were returned to Dr. Burdick, she was so busy the documents did not get completed and submitted. From Dr. Burdick's testimony, it appears that when appellant withdrew her OWCP claim, these documents were simply put aside and never considered in connection with appellant's leave request.

Along with her appeal, appellant submitted to the Board a letter to the deciding official, Douglas Kelsey, from Archana G. Leon-Guerrero, M.D., Psychiatrist/Medical Director, dated April 7, 2003, in which Dr. Leon-Guerrero explains that appellant has been under her care since October 23, 2002, for "Major Depression and Post-Traumatic Stress Disorder." Dr. Leon-Guerrero also explained that stress severely exacerbated appellant's asthma, and that she has been working with appellant's primary care physician in taking care of this condition.[52] IAF tab 1.

As previously discussed, both Dr. Ericson and Dr. Leon-Guerrero testified at the hearing. Dr. Ericson testified that from the time she saw appellant on October 16, 2002, through April 2003, appellant was not capable of working due to her physical and mental conditions. Dr. Ericson stated that appellant's incapacitation in October and November 2002 was due to anxiety symptoms; appellant was afraid to go anywhere. Dr. Ericson further testified that after the typhoon that hit Guam in December 2002, appellant's asthma condition worsened significantly, and when she saw her in early January 2003, appellant was

---

[52]  Mr. Kelsey testified that he never received this letter. The first time he saw the letter was the week before the hearing on appellant's appeal. Kelsey test.

wheezing, her chest was tight, she was coughing incessantly, and had problems breathing. At the end of January and the beginning of February, appellant was pale, still wheezing, extremely anemic, and had a rapid heartbeat. Ericson test. According to Dr. Ericson, appellant could not have worked in January with her asthma and her anemia, and that appellant's anemia did not significantly improve in February 2003. Dr. Ericson testified that she filled out forms for appellant to excuse her from work but did not do a detailed summary. Dr. Ericson could not recall appellant having requested a specific narrative. Dr. Ericson's testimony to the effect that appellant was incapacitated for duty during January and February 2003, because of an asthma condition exacerbated by anxiety and acute stress disorder, was confirmed by the testimony of Dr. Leon-Guerrero.

Dr. Leon-Guerrero testified that she first saw appellant on October 23, 2002, and since then on a fairly regular basis. Dr. Leon-Guerrero diagnosed appellant as suffering from "acute stress disorder." She described appellant as being very stressed, extremely anxious, and fearing for her life. Appellant was tearful, unable to sleep or eat, and exhibited persecutory ideation. According to Dr. Leon-Guerrero, during the latter part of 2002, appellant was in no condition to return to work at the school with Principal Masters. In treating appellant's condition, Dr. Leon-Guerrero prescribed sleeping pills (zanex) for her anxiety and insomnia, and antidepressants for her post-traumatic stress disorder and depression. Leon-Guerrero test. Dr. Leon-Guerrero also stated that appellant had overvalued suspicious thoughts, and, by the middle of January, she felt comfortable calling appellant's suspiciousness mild paranoia, and prescribing a psychotic medication (risperdal). She found appellant was very fearful of Principal Masters and officials at DODEA, and that her anxiety was heightened by the fact her doctor's excuses were not being accepted. Dr. Leon-Guerrero testified that appellant's psychiatric condition would have allowed her to return to work in February 2003, as long as she did not have to work around Principal Masters.

Dr. Leon-Guerrero testified that appellant did not show her the January 14, 2003, letter from Dr. Burdick requesting information on appellant's medical condition, and that she would have provided the information if she had known it was needed. Dr. Leon-Guerrero stated that she and appellant had discussed the fact her leave requests were not being approved, and although appellant could not understand why this was so, she was unwilling to allow Dr. Leon-Guerrero to contact school officials directly. Dr. Leon-Guerrero felt this was part of appellant's paranoia.

Based on the evidence discussed above, I find appellant was incapacitated for duty during the relevant period, January 6, 2003, through February 14, 2003, by reason of her asthma condition and anemia. I further find that in addition to her physical illnesses, appellant suffered from a mental condition that exacerbated her asthma and caused her to be unable to work around Principal Masters. I also find that the agency was made aware of appellant's medical conditions by the medical certificates dated October 16 and 31, 2002, and January 10, 2003, and the Attending Physician's Report dated January 27, 2003, signed by Dr. Ericson. The agency was advised that appellant was suffering from severe asthma, situational anxiety, depression, insomnia, and severe stress reaction, and that she was being treated for these conditions by Drs. Ericson and Leon-Guerrero. The agency was also advised by Dr. Ericson that appellant was unable to work during the period January 3rd through February 14, 2003, because of "severe asthma" and "severe stress reaction." Accordingly, I find appellant presented the agency with what should have been administratively acceptable evidence of incapacitation, in that the information provided by appellant's primary physician contained a diagnosis and a prognosis (return to work date), and, on the Attending Physician's Report, a statement that appellant was totally disabled for work from October 16, 2002, through February 14, 2003, a brief statement of appellant's asthma symptoms, and an indication of treatment. Additionally, appellant had 76 hours (9½ days) of available sick leave. Under

these circumstances, I find the agency has failed to justify its denial of appellant's requests for leave for at least 9½ days, i.e. January 6, 2003, to noon on January 17, 2003. *See* 5 C.F.R. §§ 630.401(a)(2) and 630.403(a) (a medical certificate may be considered administratively acceptable evidence). *See, e.g., Allen v. Department of the Army*, 76 M.S.P.R. 564, 568-69 (1997) (certification of treating psychologist that appellant was disabled from working due to a stress disorder stemming from his disputes with his supervisor); *Young v. U.S. Postal Service*, 79 M.S.P.R. 25, 32 (1998) ("If an employee has sufficient sick leave to cover the period in question, the agency must grant the leave request when the employee has provided administratively acceptable evidence of incapacitation because of illness or injury, regardless of whether the employee has complied with applicable leave procedures.").

For the same reasons, I also find the agency has failed to justify its refusal to grant appellant leave without pay (LWOP) for the period of her absences not covered by her sick leave, i.e., from noon on January 17, 2003, to February 17, 2003. The granting of LWOP is discretionary with the agency; however, a refusal to grant LWOP must be reasonable. *Young v. Department of Veterans Affairs*, 83 M.S.P.R. 187, 193 (1999); *Young v. U.S. Postal Service*, 79 M.S.P.R. 25, 38-39 (1998). Denial of LWOP is reasonable if there is no foreseeable end in sight to the employee's absence and the absence is a burden to the agency. *Id. See Bologna v. Department of Defense*, 73 M.S.P.R. 110, 114 (1997), *aff'd*, 135 F.3d 774 (Fed. Cir. 1997) (Table). In the instant case, appellant presented the agency with medical information showing she was unable to work from January 6, 2003, through February 14, 2003, because of severe asthma and a severe stress reaction, and that she could return to work on February 17, 2003. Furthermore, following the holiday on February 17, 2003, appellant did in fact report for work on February 18, 2003. Thus, there was a foreseeable end to appellant's incapacitation. There is no evidence showing that appellant's absence was an undue burden on the agency. To the contrary, the agency prolonged the absence

by placing appellant on administrative leave when she returned to duty on February 18, 2003. Under the circumstances, I find the agency's failure to grant appellant LWOP for the period January 17, 2003, through February 14, 2003, was not reasonable. The agency has failed to establish that it properly denied appellant's request for leave for the period January 6, 2003, through February 14, 2003.

Such a finding is further supported by the medical certificate dated April 11, 2003, appellant submitted to the deciding official (IAF tab 10, subtab H), the April 7, 2003, letter from Dr. Leon-Guerrero to Dr. Doug Kelsey (IAF tab 1) appellant submitted to the Board,[53] and the hearing testimony of Dr. Ericson and Dr. Leon-Guerrero. On the medical certificate dated April 11, 2003, Dr. Ericson stated that appellant was under her care for severe exacerbation of asthma, which was difficult to control, required multiple office visits, near hospitalization, and aggressive medical management. Dr. Ericson confirmed the severity of appellant's medical condition during the relevant period in her hearing testimony. Dr. Leon-Guerrero also described appellant's mental and physical condition during the relevant period at the hearing, and testified, in effect, that appellant's reluctance to comply with leave procedures was part of her paranoia. Dr. Leon-Guerrero testified that appellant refused to allow her to contact school officials out of fear that her psychiatric condition could be grounds for removal. The Board has held that a charge of AWOL will not be sustained if the appellant presents evidence to the Board, that was not previously presented to the agency, showing that she was incapacitated for duty during the relevant time period. *Young v. U.S. Postal Service*, 79 M.S.P.R. 25, 32 (1998). *See also Burge v. Department of the Air Force*, 82 M.S.P.R. 75, 89 1999). As the hearing testimony of appellant's treating physicians confirms her incapacitation for duty

---

[53] Dr. Kelsey testified that he did not see this letter until he was reviewing the case file in preparation for testifying at the Board hearing.

during the relevant period, and provides some explanation for her behavior regarding requesting leave, I find this evidence shows that appellant was entitled to leave, sick and LWOP, and the agency's denial of leave was inappropriate.

The agency argues that the evidence submitted by appellant to the Board does not remove her obligation to follow established leave procedures and, therefore, its denial of leave was appropriate. In support of its position, the agency cited the Board's decision in *Zeiss v. Veterans Administration,* 8 M.S.P.R. 15, 17-19 (1981). Yet, I find the situation in *Zeiss* can be distinguished from that in the instant case. In *Zeiss,* the appellant failed to provide the agency with any medical documentation of illness despite numerous notices that he must do so, and only produced such evidence before the Board; whereas, in the instant case, appellant supplied the agency with medical evidence showing she was suffering from mental and physical illnesses and needed leave from work. Thus, I found the agency's argument unpersuasive.

The Family and Medical Leave Act also supports a finding that the agency abused its discretion in denying appellant leave for the period January 6, 2003, through February 14, 2003. The Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601, 5 U.S.C. § 6381, gives "eligible" employees of a covered employer the right to take unpaid leave, or paid leave, if earned, for up to 12 workweeks in any 12-month period because, *inter alia,* the employee's serious health condition makes the employee unable to do her job. 5 U.S.C. § 6382(a)(1). A "serious" health condition is defined as "an illness, injury, impairment, or physical or mental condition that involves ... continuing treatment by a health care provider." 5 U.S.C. § 6381(5)(B); *Covington v. Department of the Army,* 85 M.S.P.R 612, 620-21 (2000). An employee is not required to explicitly invoke the FMLA in requesting covered leave. *Covington v. Department of the Army,* 85 M.S.P.R. at 621; *Landahl v. Department of Commerce,* 83 M.S.P.R. 40, 43 (1999); *Ellshoff v. Department of the Interior,* 76 M.S.P.R. 54, 76 (1997). It is sufficient that the employee make the agency aware

of circumstances that would warrant leave under the FMLA. *Covington v. Department of the Army*, 85 M.S.P.R. at 621; *Landahl v. Department of Commerce*, 83 M.S.P.R. at 43.

In the instant case, the information appellant provided the agency showed she had a health condition that met the definition of a "serious" health condition under the FMLA. Appellant requested FMLA leave for a serious incapacitating illness/injury in her leave request dated October 17, 2002. *See* Ag. Ex. 6. Furthermore, the illnesses/injuries were identified as asthma, situational anxiety, depression and stress reaction on the accompanying medical certificates signed by Drs. Ericson and Duenas of The Doctors' Clinic. *Id.* Additionally, subsequent medical certificates and the Attending Physician's Report submitted to school officials by appellant showed that she was receiving continuing treatment for these medical conditions by Dr. Debra Ericson and Dr. Archana Leon-Guerrero. *See* medical certificates, Ag. Ex. 6; IAF tab 11, subtabs U, W, and 4bb; *See also*, facsimile coversheet (appellant receiving medication therapy for asthma condition), IAF tab 11, subtab U. As appellant suffered from physical and mental illnesses which required continuing treatment from a health care provider during at least the period October 16, 2002, to February 17, 2003, I find she had a serious health condition within the meaning of the FMLA. *See Young v. U.S. Postal Service*, 79 M.S.P.R. 25, 35 (1998) ("continuing treatment" includes "a period of incapacity of more than three days that also involves treatment two or more times by a health care provider, or treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of a health care provider").

The leave period covered by appellant's requests for leave for a serious illness covers a period of approximately 6 weeks, which is much less than the 12 weeks of leave mandated by the FLMA. There is also no evidence showing that appellant had already used 12 weeks of FMLA leave during the 12 month period ending on February 17, 2003. Thus, I find appellant was eligible for FMLA

leave, and the agency's denial of her requests for leave for the period January 6, 2003, through February 14, 2003, was inappropriate.

Specification 3 of charge I is not sustained.

Conclusion.

The agency has established that appellant was absent without leave for a little over one hour on October 11, 2002. The charge of AWOL is sustained. *See Wesley v. U.S. Postal Service*, 94 M.S.P.R. 277, 288 (2003) (Proof of one or more of the supporting specifications is sufficient to sustain a charge.).

Charge II: Disorderly Conduct

The agency charged appellant with four specifications of "Disorderly Conduct," only two of which were sustained by the deciding official, Specifications 1 and 3. In Specification 1, the agency alleged the following:

> On Friday morning, 11 October 2002, you (appellant) engaged in inappropriate conduct in your classroom at Andersen Elementary School, which was disruptive. Specifically, when your supervisor, Principal Joe Masters, entered your classroom to question what, if any, assistance you needed in putting away items that had previously been stored in a large metal storage cabinet, you appeared to become upset. Mr. Masters began to leave the classroom to avoid a confrontation in front of the students and you loudly told him "The lawyer said I could keep the shelf." Mr. Masters continued toward the door without comment and you followed him saying in a loud voice that you were going to add this to your complaint. Mr. Masters responded that he didn't know about any type of complaint and that you could do that if you wanted. As Mr. Masters backed out of the door, you came close to him, waved your finger in his face, and loudly questioned whether he was trying to threaten you. Mr. Masters asked you to put your finger down, advised you not to threaten him, and questioned whether you wanted him to go. You raised your voice louder and said "Are you saying you will get me out of here?" He responded that was not what he had said and you again, in a loud voice said, "Are you saying you will get me out of here?" He again told you that is not what he said and walked away. You began loudly saying "I want security. I want security." Although for some portion of this incident Mr. Masters was in the hallway, you were standing in the classroom doorway with the door

> open and your loud statements could be heard by the students in your
> classroom. Your actions caused a complete disruption of the
> educational mission in that classroom.

*See* Notice of Proposed Removal, IAF tab 1 and tab 11, subtab O. Based on the

evidence discussed and the factual findings made under the subheading "Factual

Findings," I find appellant engaged in the conduct specified in specification 1,

and that such conduct is inappropriate for any subordinate much less a teacher. I

further find that appellant's conduct was disruptive and disorderly. Specification

1 is established by a preponderance of the credible evidence in the record, and is

sustained.

In Specification 3, the agency alleged appellant engaged in the following

conduct:

> On 14 and 15 October 2002, you made three harassing telephone
> calls to Ms. Deborah Webster, the parent of one of your students,
> Danney Webster. During those calls, you proceeded to make
> negative comments about your supervisor, Mr. Masters, to include
> the following: that you weren't safe there (at Andersen Elementary
> School), that he had threatened your life in front of the children, that
> you believed if you returned to school that Mr. Masters would burst
> in and do a number on you. You told Ms. Webster that Mr. Masters
> had told a parent that his son was a liar, after his child wrote that Mr.
> Masters screamed at her in a deep menacing voice. You advised Ms.
> Webster to keep her daughter home from school. You further alleged
> that you were concerned the whole thing (the incident on 11 October
> 2002) would be whitewashed over and that the children would be
> brainwashed; and that you didn't want any witness tampering by the
> school. To this end, you solicited Ms. Webster to call the Family
> Advocacy Office to go into the classroom and counsel the children
> about the incident. Lastly, you solicited Ms. Webster not to disclose
> your telephone number to the school district. These calls were
> inappropriate and extremely disconcerting to Ms. Webster who,
> afterwards, questioned your continued ability to perform as a
> classroom teacher. As a result, Ms. Webster asked the school
> administrators to remove Danney from your class.

*See* Notice of Proposed Removal, IAF tab 1 and tab 11, subtab O. Appellant

responded to this allegation by stating that: (1) It was not based on a sworn

statement; (2) she never advised a child to stay at home unless there was an

illness; (3) she asked Ms. Webster not to disclose her telephone number to the school district because her life was threatened; (4) the claims that her calls to Ms. Webster were inappropriate and extremely disconcerting to Ms. Webster and that Ms. Webster questioned her continued ability to perform as a classroom teacher were not based on a sworn statement, and (5) Danney was not removed from her classroom. *See* "Cliff Notes and Point by Point Rebuttal, IAF tab 11, subtab L. Appellant also denied advising Ms. Webster to keep her child at home but admitted saying that she did not want any witness tampering in school, and claimed Ms. Hall told her not to talk to the students at all. *See* written Rebuttal by Charges (9 pages), IAF tab 11, subtab L. Appellant also confirmed that she had recommended Ms. Webster call the Family Advocacy Office for counseling, and admitted she told Ms. Webster that she did not want her number disclosed because her life was threatened. Appellant also made numerous negative statements regarding Mr. Masters and Ms. Hall. *Id.*

At the hearing, appellant testified that she called Ms. Webster because she wanted to talk to her, she knew Ms. Webster's daughter enjoyed being in her class, and she felt she could speak to Ms. Webster confidentially. Appellant further testified that she told Ms. Webster many things, including that she feared for her life, and that she was concerned about what happened and how it affected the children. Appellant additionally testified that Ms. Webster did not tell her that she felt uncomfortable or harassed, and did not tell her to get off the telephone. Appellant also admitted that she called Ms. Webster to ask her if she had caller identification, and then requested she not give appellant's telephone number to the school administration. Appellant stated that she had no idea Ms. Webster was unhappy about the telephone calls she received from appellant. Appellant test.

It is undisputed, and established by the record, that following the incident between herself and Mr. Masters on October 11, 2002, appellant made several telephone calls to Deborah M. Webster, the mother of one of her students. Ms.

Webster made a contemporaneous written account of these telephone calls, and submitted a copy to Assistant Principal Sharon Hall along with a cover letter dated October 17, 2002. IAF tab 12, subtab 4gg. Ms. Webster also spoke with Ms. Hall by telephone on October 15, 2002, and informed her of the subject matter of what she described as two bizarre telephone calls from appellant on October 14 and 15, 2002. *Id.* Ms. Webster expressed concern regarding the placement of her child, and clearly indicated that she did not wish her child to be in a classroom run by appellant, as she felt appellant had mental problems. *Id.* Ms. Webster testified at the hearing and confirmed the accuracy of the written summary of her telephone conversations with appellant. Ms. Webster also testified that she was amazed at appellant's lack of professionalism, and, speaking as a parent, she did not believe appellant possessed the stability to be an educator.

Based on the testimony of Ms. Webster,[54] and her written summaries of appellant's telephone calls, I find the agency has established the facts contained in specification 3 by a preponderance of the evidence. This specification is sustained.

### Conclusion

Based on the two sustained specifications, I find the agency has established its charge of disorderly conduct, and it is sustained.

### Charge III – Failure to Follow Instructions

The agency charged appellant with 7 instances of failure to follow instructions but only specifications 1, 5 and 6 were sustained by the deciding official.[55]

---

[54] I found Ms. Webster to be a credible witness and her statements were largely unrebutted.

[55] *See* Notice of Proposed Removal and Decision letter, IAF tab 10, subtab F, and tab 11, subtab O.

In Specification 1, the agency alleged appellant failed to follow instructions to sign out before she left the school grounds on October 11, 2002. In support of its charge, the agency submitted evidence showing that Andersen Elementary School has a policy requiring that teachers sign out at the office before leaving the school campus during the duty day. *See* excerpts from Teacher's Handbook, "Attendance Policy," IAF tab 12, subtab 4tt. Furthermore, I find appellant was aware of the policy as evidenced by a sign-out sheet containing notations of the times appellant left campus on October 9 and 10, 2002, and appellant's response to agency request for admission number 7. IAF tab 12, subtab 4hh, and tabs 23 and 24.

It is undisputed appellant did not sign out at the office before leaving the Andersen Elementary School campus on October 11, 2002, during her duty hours. *See* sign out sheet, IAF tab 12, subtab 4hh.

In responding to the notice of proposed removal, appellant indicated that she did not sign out because she was "traumatized," did not wish to run into Mr. Masters, and feared for her life . *See* written response to removal proposal, IAF tab 12, subtab L; appellant test. Although the evidence clearly shows that appellant was emotionally upset that day, it does not support a finding that she was so severely traumatized or upset that she could not have informed the office, at the very least by telephone or through Ms. Flores, that she was leaving the school premises, and explain why she felt unable to sign out on her own behalf.[56] Ms. Hall stated, without rebuttal, that following the incident with Mr. Masters, appellant had come by the school office at approximately 8:55 a.m. to obtain the

---

[56] Appellant testified that she did not have the presence of mind to call the office. I find her statement in this regard incredible. Appellant clearly had the "presence of mind" and ability to carry out the tasks that were important to her that day, such as attending meetings for her students, gathering her students from the playground and dismissing them, calling security and speaking with security personnel and officers from the Guam Police Department.

location of the special education meeting she was attending. *See* Memorandum for Record signed October 11, 2002, IAF tab 12, subtab 4ii. Appellant had also refused the assistance of Ms. Hall, declined to see the school nurse, and insisted on attending IEP meetings for two of her students that morning. Following the IEP meetings, appellant was able to gather up her students from the substitute teacher and then dismiss them according to the schedule. In addition, appellant called for and spoke to security personnel and officers from the Guam Police Department before she left the school on October 11, 2002. As appellant had the ability to carry out all of these tasks, more likely than not she had the ability to sign out or at least notify the office that she was leaving and have someone sign out on her behalf.[57]

I find the agency has established specification 1, and it is sustained.

In Specification 5,[58] the agency alleged:

> During staff orientation conducted on or about 7 August 2002 all staff members were advised that parental consent was required prior to audio taping and/or video taping students. Nonetheless, on 11 October 2002, you failed to follow this instruction by videotaping (sic) your students in your classroom at Andersen Elementary School without first having gained parental consent.

Notice of Proposed Removal, IAF tab 1 and tab 11, subtab O.

Mr. Masters testified that the school had a policy that required parental permission before a student could be video taped, and that teachers were advised of this policy during the orientation that took place on August 5 and 6, 2002.[59] Mr. Masters further testified that appellant was present for the orientation. It is

---

[57] Ms. Flores was with appellant for most of the time from 11:30 a.m. until she left the school at approximately 1:40 p.m., and could have either accompanied appellant to the office to sign out or signed out on her behalf.

[58] Specification 5, as the deciding official pointed out, was erroneously numbered specification 6 in the notice of proposed removal.

[59] *See* IAF tab 12, subtab 4pp.

undisputed that on October 11, 2002, appellant was video taping a student discussing her feelings regarding the loss of the cubby organizer when Mr. Masters, with Mr. Barnhart, entered appellant's classroom. Appellant did not have parental permission to video tape her students.[60]

Appellant testified that she attended teacher orientation in August 2002 but does not recall the instruction that students could not be video taped without parental permission. Yet, appellant also admitted it was possible such an instruction was given. Furthermore, appellant went to great lengths to explain why she had video taped students, stating that she used the video machine because she could not find her still camera,[61] and explaining it was only a short video. She also claimed Mr. Masters said it was okay for her to have recorded the children, and that: "Parental consent should also be on file." Yet, there is no evidence that parents of appellant's students consented to having their children video taped; and the consent forms on file do not reflect such consent. *See* IAF tab 12, subtab 4ss. Also, as previously discussed, Mr. Masters denied having approved appellant's video taping students, and I found his testimony credible.[62] I find a preponderance of the credible evidence shows appellant was aware she needed parental permission to video tape students, and that she had not obtained such permission before video taping one or more of her students on October 11, 2002.

The agency has established specification 5, and it is sustained.

---

[60] *See* parental release forms, IAF tab 12, subtab 4ss; Webster testimony (parent concerned over appellant's having video taped students indicating she had not given permission for her child to be video taped);

[61] *See* summary of oral response, IAF tab 11, subtab L.

[62] *See* footnotes 8 and 17, supra.

In specification 6,[63] the agency alleged appellant failed to follow instructions as follows:

> On 12 November 2002, Ms. Sherry Hall questioned where the books were that students had ordered from the Scholastic Book Club. When you told her the books were at your home, she told you to box the books up and deliver them to the front gate where Ms. Hall would pick them up and ensure they were given to the students. You indicated that you would do so. However, Ms. Liz Flores subsequently distributed the books to some of your students. When questioned, Ms. Flores indicated you had called her and asked her to distribute the books, and had called the parents of your students to set up a time for them to come to Ms. Flores' classroom and pick up the books.

Notice of Proposed Removal, IAF tab 11, subtab O. These facts are established by the testimony of Sharon Hall and Elizabeth Flores.

Ms. Hall testified that she asked appellant for the location of the books that were ordered by her students, and appellant said they were at her home. Ms. Hall also testified that she offered to have George and John pick them up but appellant refused to give her an address. Ms. Hall further testified that she then told appellant to box the books up and bring them to the front gate of Andersen Air Force Base, and either she, George or John would pick the books up there. According to Ms. Hall, appellant agreed to this arrangement. Ms. Hall additionally testified that, a few days later, she learned that Ms. Flores had contacted all of the parents of appellant's students that had ordered books, and told them that if they would come to the school and see her, she would give them the books for their children.

Ms. Flores testified that she was told by Mr. Masters and Ms. Hall that she could not act as a "go between" or intermediary between appellant and the administration. Ms. Flores also testified that appellant had called and asked her

---

[63]    Specification 6 was erroneously labeled specification 7 in the notice of proposed removal.

to deliver some books to the students, and that she did this because she figured the books belonged to the students not the school. Ms. Flores further testified that she had only given out some of the books when she was called into the office and told she could not distribute the books.

Appellant denied Ms. Hall told her to box up the books and deliver them to the front gate. IAF tab 11, subtab L. Appellant stated that she never said she would give Ms. Hall the books, and indicated she would not give Ms. Hall the books as she did not trust her. *Id.* Appellant also stated that she told Ms. Hall, she (appellant) was responsible for the book orders, and she had to make sure the books got to the parents. Yet, appellant also indicated that Ms. Hall had in fact directed her to bring the books to the front gate. Appellant said she was too sick (to bring the books) and Ms. Hall knew this, and that Ms. Hall had insisted she drive while under medication which made her drowsy. Appellant further stated that "She (Ms. Hall) recommended that George and John come to the front gate to meet me." *Id.* Appellant admitted she had asked Ms. Flores to pass out the books to the parents, and that Ms. Flores had called the parents and asked them to pick the books up. *Id.*

Based on the testimony of Ms. Hall, and the statements of appellant indicating she was told to bring the books to the front gate, I find a preponderance of the credible evidence establishes that appellant was directed by her supervisor, Ms. Hall, to bring the books the students had ordered from the Scholastic Book Club to the front gate of Andersen Air Force Base where they would be picked up by either Ms. Hall or John or George. Based on the testimony of Ms. Flores and the statements of appellant, I find appellant deliberately chose to ignore the instructions she was given, and gave the books to Ms. Flores to distribute to the parents. I further find that Ms. Flores carried out appellant's instructions and distributed the books to a number of parents.

In a post-hearing brief, appellant argues that she did not have to follow Ms. Hall's direction to bring the books to the front gate of Andersen Air Force Base

and deliver them to the maintenance men, as the books were supplementary material ordered from the mainland. She further argues that although it was important to get the books to the children, she did not have to do so in a particular manner. IAF tab 30. Appellant additionally claims that Ms. Hall did not give clear enough directions to be understood. *Id.* I find these arguments unpersuasive. Ms. Hall's directions were clear, and appellant understood but did not agree with them. Yet, as an employee, appellant was bound to follow the directions of her supervisor. *See Larson v. Department of the Army*, 91 M.S.P.R. 511, 519 (2002) (An employee must first comply with an order and then, if he disagrees with the order, register his complaint or grievance later, except in certain limited circumstances where obedience would cause him irreparable harm.).[64] Appellant's failure to follow the instructions she was given by Ms. Hall constitutes misconduct.

The fact that appellant may have been taking medication that made her drowsy also does not excuse her failure to follow instructions. The gist of the instruction was that appellant ensure that the books were left at the front gate of Andersen Air Force Base to be picked up by Ms. Hall, John or George. If appellant felt unable to drive, she could have had someone either drive her to the base or deliver the books to the front gate on her behalf. Yet, appellant chose not to do either of these things. Instead, she deliberately ignored the direction she was given by her supervisor, and had the books delivered to the parents of the children by the means she felt was appropriate, i.e., by Ms. Flores. Such an action constitutes misconduct under the circumstances, and such misconduct is

---

[64]    Appellant may have believed she was in danger from Mr. Masters, but there is nothing showing appellant feared, or had any reason to fear, for her safety from Ms. Hall. *See Larson v. Department of the Army*, 91 M.S.P.R. 511, 519 (2002) (An appellant's subjective and unsupported apprehension of danger does not justify his refusal to perform his duties.).

made even more egregious by the undisputed fact that Ms. Flores had previously been told she was not to act as an intermediary for appellant.

Appellant additionally argues that psychological inability to follow an order will sometimes excuse non-compliance citing the Board's decision in *Kulinski v. U.S. Postal Service*, 37 M.S.P.R. 574 (1988).[65] In support of her argument, appellant points to the testimony of Dr. Leon-Guerrero who stated that it would have been nearly impossible for appellant to come near the school so long as she believed Mr. Masters might be there. Yet, appellant was not asked to come to the school, she was directed to drop the books off at the front gate of a large Air Force Base where they would be picked up by persons other than Mr. Masters. Furthermore, appellant could have complied with the order by having either Ms. Flores or someone else drive her to the base or drop the books off for her. What appellant was not authorized to do was avoid delivering the books to the administration and have Ms. Flores distribute them directly to the parents.

In her closing argument appellant contends that her failure to follow Ms. Hall's instructions was not willful, and that she complied with the spirit of the order if not the letter. Yet, I find a preponderance of the evidence shows that appellant's failure to follow the instructions she was given was willful. She was fully aware that she was told by her supervisor to drop the books off at the front gate where they would be picked up and distributed by the administration. Yet, as she testified, she did not trust her supervisor so she chose to do things her way, and have Ms. Flores distribute the books to the parents of the students who had

---

[65] In *Kulinski*, the appellant was diagnosed as suffering from bipolar disorder, manic episode, and mixed personality disorder with dependent and schizoid traits. The Board found, however, that the evidence was insufficient to show that the appellant was unable, by virtue of his mental condition, to comply with the agency's instructions. *Kulinski*, 37 M.S.P.R. at 577-78. Similarly, in the instant case the evidence is insufficient to show that on November 12, 2002, appellant was unable, by virtue of her mental or physical condition, to comply with Ms. Hall's instructions.

ordered books. Appellant lacked authority to countermand the directions she was given by Ms. Hall and her actions in doing so were willful.

I find the facts contained in specification 6 are established by a preponderance of the credible evidence, and specification 6 is sustained.

### Conclusion

Based on the sustained factual specifications, I find the agency has established its charge of failure to follow instructions and it is sustained.

## Affirmative Defenses

### Harmful Procedural Error

Appellant alleged the collective bargaining agreement requires the agency to use progressive discipline, and the agency did not use it in appellant's case. *See* Summary of Prehearing Conference dated August 5, 2003, IAF tab 26. By this allegation, appellant is raising the affirmative defense of harmful procedural error.

To establish her defense of harmful procedural error, appellant must show an error by the agency in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error. 5 C.F.R. § 1201.56(c)(3); *Scott v. Department of Justice*, 69 M.S.P.R. 211, 242 (1995). Reversal of an action is warranted only where a procedural error, whether regulatory or statutory, is likely to have had a harmful effect upon the outcome of the case before the agency. *See Scott v Department of Justice*, 69 M.S.P.R. at 242.

Article 25, Section 1(d) of the applicable Master Labor Agreement provides that:

> "The Agency recognizes the concept of progressive discipline, and generally actions imposed should be the minimum that can reasonably be expected to correct and improve employee behavior and maintain discipline and morale among other employees."

IAF tab 9, subtab 2.

Appellant presented no evidence showing the agency violated this provision of the Master Labor Agreement. By its terms, the provision does not mandate the use of progressive discipline in every case. Rather, it provides that "generally" actions should be the minimum that can reasonably be expected to correct and improve employee behavior. For the reasons discussed below under penalty, I find the penalty assessed by the agency was reasonable under the circumstances.

Appellant has not established that the agency violated the Master Labor Agreement by the manner in which it effected her removal for the sustained misconduct. Appellant has not established her defense of harmful procedural error.

### Discrimination

Appellant alleged the agency discriminated against her on the bases of her race (Chamorro), color (brown), and ethnicity (Chamorro/Hispanic), and subjected her to sexual harassment by Principal Joseph Masters. *See* Summary of Conference, IAF tab 26.

Appellant may prove her allegations of discrimination by presenting "direct" evidence that any of the factors of her race, color or sex was a motivating factor in the agency's removal action. *See Jones v. Department of the Army*, 68 M.S.P.R. 398, 403 (1995). Appellant stated that Mr. Masters and Ms. Hall are biased against persons of Chamorro ancestry pointing to certain actions that were taken since Mr. Masters took over as principal of Andersen Elementary School.[66] Yet, there is no evidence that any of the actions taken by Ms. Hall and Mr. Masters were taken or not taken for anything other than legitimate reasons.[67]

---

[66] *See* appellant's interrogatory answers, IAF tab 23.

[67] Appellant filed an Equal Employment Opportunity (EEO) complaint regarding her reassignment from the Reading Improvement Specialist position to the third-grade teacher position. *See* attachments to appeal, pp. 20 and 29, IAF tab 1. The EEO proceedings were still pending during the course of this proceeding.

Furthermore, there is no credible evidence indicating any bias on the part of either Ms. Hall or Mr. Masters against persons of color or of Chamorro ancestry.[68] The record reflects that Mr. Masters did things differently than the previous principal but this in and of itself does not establish bias or discrimination on his part. I find a preponderance of the credible evidence shows it was appellant's behavior, and not her race, color, ethnicity or sex, that was the motivating factor in the removal action.

Appellant may also establish a prima facie case of unlawful discrimination through circumstantial evidence. To do so, appellant must show that: (1) She is a member of a protected class (Chamorro, brown and female); (2) she suffered an adverse action (removal); and (3) there was a causal connection between her membership in the protected class and the adverse action. *See Jones v. Department of the Army*, 68 M.S.P.R. 398, 406 (1995).

There is no evidence establishing a causal connection between appellant's membership in a protected class and her removal. As previously stated, a preponderance of the evidence shows that appellant was removed from her position because of the behavior described in the sustained factual specifications supporting the charges of AWOL, disorderly conduct and failure to follow instructions.

Appellant has not established her defense of discrimination on the bases of her race, color, ethnicity or sex.

Sexual Harassment

Appellant contends that she was sexually harassed by Principal Masters by means of gestures, remarks and stares. IAF tab 23. Appellant testified that at a welcome breakfast for Mr. Masters in September 2000, when he first came to Andersen Elementary School, she went up to him and he held out his hand.

---

[68] Mr. Masters is of black, American Native Indian, and French ancestry. Masters test. Ms. Hall is white and of Irish and English ancestry. Hall test.

Appellant further testified that when she took Mr. Masters' hand, he gripped her hand for an extended period of time while he looked at her face. According to appellant, Mr. Masters' eyes traveled down to her breasts and then back up. Mr. Masters, on the other hand, testified that he never held appellant's hand.

I find it is more probably true than not that Mr. Masters shook appellant's hand at a welcome breakfast when he first came to the school. This would be a normal and proper thing for a new principal to do when meeting one of his teachers. It would also be normal and proper for the principal to look carefully at the face of the teacher in order to fix a name with a face. As for appellant's claim that he held her hand too long and looked at her breasts, I find her statements in this regard incredible. Although this may well have been appellant's impression, I find it highly unlikely that this is what actually occurred. Considering the record as a whole, I find appellant to be highly emotional and prone to exaggeration. She also appears to have a tendency to take things personally which are not meant to be personal. There is no evidence that Mr. Masters ever attempted to socialize with appellant, showed anything more than a professional interest in her, or afforded her special treatment. Thus, I find it is more probably true than not that Mr. Masters simply shook appellant's hand in a greeting when he met her at the welcome breakfast.

Appellant also described an incident that took place outside the school building during the 2000-2001 school year. Appellant testified that she had just dropped off her students and was walking between buildings to her classroom when she saw Mr. Masters looking at her. Appellant stated that the wind was blowing at the time, and she was holding her skirt to prevent it from blowing up. Appellant further testified that she walked toward Mr. Masters and he asked her where she was coming from. According to appellant, when she told him the cafeteria, he took a deep breath and said "smells good." Appellant additionally testified that when Mr. Masters said this his eyes went down toward her leg area, and she felt he was smelling her. Appellant's testimony is uncorroborated.

Mr. Masters testified that he never told appellant that she smelled good that he could recall.

I find appellant has a vivid imagination. "Smells good" is a perfectly ordinary remark to make to someone who said they had just come from the cafeteria. More likely than not what was meant by such a remark is that the cooking odors coming from the cafeteria smell good. As for Mr. Masters looking at appellant's leg area, I seriously doubt that this occurred or if it did it was unintentional. In all probability, what actually happened was that appellant was embarrassed at having Mr. Masters observe her trying to deal with her skirt blowing up in the wind, and she made assumptions that had no validity.

In her oral response to the notice of proposed removal, appellant gave a slightly different description of her meeting with Mr. Masters. *See* summary, IAF tab 11, subtab L. She stated that she asked Mr. Masters where he had come from and he replied the cafeteria. She further stated that he took a deep breath, and said "your perfume smells good." The inconsistency in appellant's description of the event casts doubt on the credibility of appellant's story. Further doubt is raised by the lack of any evidence that appellant actually wore perfume to work. Furthermore, even assuming Mr. Masters complimented appellant on her perfume, such a one-time remark does not necessarily rise to the level of sexual harassment. As previously stated, there is no evidence that Mr. Masters ever attempted to socialize with appellant or took anything more than a professional interest in her.

Appellant also described Mr. Masters dancing in a lewd manner with a special education aide, Jodie Barrios, at a staff Christmas party that took place on December 8, 2001. Appellant testified that she was repulsed by his behavior, and when she was supposed to be Mr. Masters' dance partner, she switched with another teacher, as she did not want to dance with him. According to appellant, Mr. Masters was upset that she did not want to dance with him and gave her a dirty look. Appellant's testimony regarding Mr. Masters' behavior was

uncorroborated and contradicted by the statements of other employees. *See* IAF tab 10, subtab I, tab 18. *See also* test. Douglas Kelsey (investigated but nothing supported appellant's allegations against Mr. Masters).

In a facsimile to EEO counselor Chandra Vickers, dated October 17, 2002, appellant asked to file a formal complaint against Mr. Masters for "continued harassment which resulted in terrorizing, sexual harassment and assault on Friday, October 11, 2002, in front of my third grade students." IAF tab 9, subtab 3. Appellant claimed Mr. Masters threatened her life and shoved his body in hers (her chest and nose-to-nose). *Id.* Appellant failed to follow up on this complaint, however, and when Ms. Vickers attempted to contact her by telephone, appellant did not return her calls. IAF tab 9, subtab 3. As discussed above, the credible evidence in the record did not establish that Mr. Masters harassed, terrorized or assaulted appellant, threatened her life or shoved his body into hers.

In its regulations, the Equal Employment Opportunity Commission defines "sexual harassment" in the following manner:

> (a) Harassment on the basis of sex is a violation of section 703 of title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.
>
> (b) In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

29 C.F.R. § 1604.11. A reasonable person standard should be applied in determining whether challenged conduct was sexual in nature or was based on the

employee's sex. *Hillen v. Department of the Army*, 66 M.S.P.R. 68, 74-75 (1994).

After carefully considering all of the evidence in the record as a whole, I find appellant has not established that she was sexually harassed by Mr. Masters. The behaviors described by appellant, and discussed above, do not meet the definition of sexual harassment. There is no credible evidence showing any physical contact between appellant and Mr. Masters of a sexual nature.[69] There is also no credible evidence that Mr. Masters made any sexual advances or remarks to appellant. The record does not show that Mr. Masters showed any personal interest in appellant or treated her any differently than her colleagues. A preponderance of the credible evidence in the record shows Mr. Masters' relationship with appellant was strictly professional.

I find appellant has not established that she was sexually harassed by Mr. Masters. *See, e.g., Viens v. Department of the Interior*, 92 M.S.P.R. 256, 263 (2002) ("Mere utterance of an epithet that engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII, and conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment ... is beyond Title VII's purview." Off hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment that constitute sexual harassment.). *See also Salazar v. Department of Energy*, 88 M.S.P.R. 161, 165 (2001).

Appellant has not established discrimination on the basis of her sex by means of sexual harassment.

Reprisal

---

[69] A handshake is not generally considered to be a sexual gesture but, rather, a formal greeting.

Appellant contends the agency removed her from her position in retaliation for her EEO complaints. To establish her claim of retaliation, appellant must show that: (1) She engaged in a protected activity; (2) the accused official knew of the activity; (3) the adverse action under review could have been retaliation under the circumstances; and (4) after careful balancing of the intensity of the motive to retaliate against the gravity of the misconduct, there was a genuine nexus between the alleged retaliation and the adverse action. *See Haack v. United States Postal Service*, 68 M.S.P.R. 275, 282 (1995).

It is undisputed and reflected by the record that appellant filed EEO complaints against Principal Joseph Masters and Assistant Principal Sharon Hall.[70] Both the proposing official, Assistant Superintendent Susan Burdick, and the deciding official, Acting Superintendent Douglas Kelsey, were aware of appellant's discrimination complaints. Test. Burdick and Kelsey. Yet, there is no evidence that either Assistant Superintendent Burdick or Acting Superintendent Kelsey had any motive to retaliate against appellant. They were not involved in appellant's discrimination complaints, and their testimony and statements clearly reflect that the instant removal action was based solely on the charged misconduct. I find appellant has not established a nexus between her EEO complaints and her removal for serious misconduct. *See, e.g., Taylor v. Department of the Air Force*, 80 M.S.P.R. 450, 457 (1998); *Lockridge v. U.S. Postal Service*, 72 M.S.P.R. 613, 624-25 (1996). *See also Richard v. Department of Defense*, 66 M.S.P.R. 146, 155 (1995) and *Peterson v. Department of Transportation*, 54 M.S.P.R. 178, 184 (1992) (where the relevant agency officials

---

[70] *See* EEO counselor's report dated May 21, 2002, regarding a complaint filed by appellant regarding her reassignment from the Reading Specialist position (also references another EEO complaint filed by appellant against Masters and Hall), and EEOC Order dated January 27, 2003, IAF tab 1 and tab 10, subtab K, pp. 56-63. 69-70. *See also* IAF tab 9, subtab 3 (appellant's October 17, 2002, complaint alleging Joseph Masters terrorized, sexually harassed and assaulted her on October 11, 2002.).

knew of the protected activity but were not accused of involvement in any of the alleged acts of prohibited discrimination, the appellant failed to show that the adverse action could have been retaliation).

Appellant has not established her defense of retaliation for EEO activities. *See, e.g., Haack v. U.S. Postal Service*, 68 M.S.P.R. 275, 282 (1995).

Conclusion

Appellant has not established her affirmative defenses.

Nexus

There is a clear nexus between the sustained charges and the efficiency of the service. An adverse action promotes the efficiency of the service when the grounds for the action relate either to an employee's ability to accomplish her duties satisfactorily or to some other legitimate government interest. *See Hatfield v. Department of the Interior*, 28 M.S.P.R. 673, 675 (1985). Unauthorized absence, by its very nature, disrupts the efficiency of the service. *Crutchfield v. Department of the Navy*, 73 M.S.P.R. 444, 448 (1997). Also, agency employees are expected to respect authority and to follow the orders of their supervisors. *Redfearn v. Department of Labor*, 58 M.S.P.R. 307, 316 (1993). Appellant's refusal to follow the instructions of her supervisors adversely affected the supervisor-employee relationship. Additionally, appellant's disorderly conduct was disruptive to the orderly operation of the school, and caused concern among parents. Accordingly, I find the agency has established a nexus between the proven misconduct and the efficiency of the service.

Penalty

The Board will review an agency-imposed penalty only to determine if the agency considered all of the relevant factors and exercised management discretion within tolerable limits of reasonableness. *Perez v. U.S. Postal Service*, 75 M.S.P.R. 503, 506 (1997); *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305-306 (1981). In making this determination, the Board will not freely

substitute its judgment for that of the agency on the question of what is the best penalty. *Wier v. Department of the Army*, 54 M.S.P.R. 348, 354-355 (1992).

The deciding official, Mr. Kelsey, carefully considered the relevant factors in making his decision to remove appellant. *See* Kelsey test.; IAF tab 12, subtab 4mm.

Appellant had six years of service with the agency, her work was at or above the acceptable level, and she received a number of commendations. *See* IAF tab 12, subtab K, pp. 4, 12, 15-16. She has no prior discipline.[71] IAF tab 12, subtab 4mm.

Appellant was a third-grade teacher in an elementary school. In this position, she had daily contact with students and parents, and her actions greatly affected the public's perception of the school district and the educational services it provides. Appellant's offenses, therefore, are serious. *See* IAF tab 12, subtab 4mm.

Mr. Kelsey testified that it is important to have qualified teachers in the classroom, therefore, absence without leave is a very serious offense as it affects the district's ability to schedule substitute teachers. The majority of the specifications of AWOL were not sustained, however, and I find the circumstances surrounding appellant's AWOL on October 11, 2002, reduced the seriousness of this particular offense.

Mr. Kelsey also testified that appellant's disorderly conduct on October 11, 2002, was serious, and the fact that it occurred in front of students made it even more serious. Appellant's telephone calls to a parent of one of her students, wherein she made disparaging remarks regarding the principal and assistant principal, were also very serious. They caused the parent to become concerned

---

[71]  Letters of caution are not counted as prior offenses. DoD DDESS Administrative Instruction 1435.1, pp. 1-4, IAF tab 12, subtab 4ll.

regarding the placement of her child, and to request that her child not be in a classroom run by appellant.

Mr. Kelsey additionally testified that appellant's failure to follow instructions was also serious in that such conduct results in chaos. He indicated that supervisors must be able to expect subordinates to follow their instructions, even when they do not agree with them.

Appellant's offenses, particularly the disorderly conduct and failure to follow instructions, had a direct adverse impact on the agency's ability to provide supervision and instruction to students. Appellant got her students involved in her dispute with Mr. Masters, and upset them by her behavior when he visited her classroom on October 11, 2002. She then compounded the problem by making several calls to a parent of one of her students in which she made disparaging remarks about school administrators. As a result of appellant's behavior, the administration received a number of telephone calls from parents expressing their concern. Appellant's failure to follow instructions regarding the video taping of students also caused parental concern. Additionally, appellant's refusal to follow the instructions she was given by Ms. Hall regarding delivery of certain books was disruptive, and resulted in her friend, and coworker, receiving a reprimand.[72]

Appellant was aware of the inappropriateness of her conduct. She was instructed on school policies during teacher orientation at the beginning of the school year. She had also received a Letter of Caution on December 15, 2000, for indicating she was going to tape a discussion between herself and Principal Masters concerning the Reading Schedule without first obtaining his permission. *See* Ag. Ex. 7. Article 9, section 2 of the Master Labor Agreement prohibits the making of a voice or tape recording of a private conversation or meeting between a management official and a bargaining unit member without the assent of all parties. *Id.* Yet, despite a school policy requiring parental permission before

---

[72] *See* letter of reprimand dated November 27, 2002, IAF tab 11, subtab L; Flores test.

video taping students and the letter of caution regarding taping without permission, appellant proceeded to video tape her students without first obtaining the permission of their parents.

Appellant also received a Letter of Caution dated September 24, 2001, for rude and discourteous behavior toward her supervisor. *See* Ag. Ex. 9. The letter advised appellant that rude and discourteous behavior is considered misconduct and will not be tolerated. Appellant was told that making threatening remarks and talking to her supervisor in a loud, insolent tone and manner was inappropriate, and that a disciplinary action could be taken against her if she spoke to her supervisor, or anyone else at Andersen Elementary School, in a rude or discourteous manner. *Id.* Additionally, in a memorandum dated March 26, 2002, appellant was advised that she must communicate and interface with coworkers and carry out her duties in a professional, courteous, and respectful manner. Ag. Ex. 8. Despite having received these admonitions, however, appellant was rude, discourteous, and disrespectful to Principal Masters when he visited her classroom on October 11, 2002.

Mr. Kelsey indicated that appellant's offenses adversely affected her supervisor's trust in her and caused him to lose all confidence in her ability to be effective in the classroom in the future.

The penalty of removal is within the range of penalties for a first offense of disrespectful conduct and a first offense of deliberate refusal or delay in carrying out an instruction. IAF tab 12, subtab 4ll. Appellant's disorderly conduct included disrespect toward her supervisor but was even more serious. I also found appellant's failure to follow Ms. Hall's instructions regarding delivery of the books was deliberate.

Appellant's disorderly conduct was well known within the community and adversely affected the reputation of the school and its administrators. *See* test. Webster, Hall, and Kelsey; IAF tab 11, subtab S.

Appellant has not demonstrated a potential for rehabilitation. She has not taken responsibility for her actions, shown any remorse, and continues to blame Mr. Masters and Ms. Hall for the incidents that gave rise to her removal.

I find the agency acted within its discretion in selecting the penalty of removal, and that the penalty does not exceed the bounds of reasonableness under the particular circumstances of this case. *See, e.g., Jones v. Department of the Army*, 52 M.S.P.R. 501, 506-507 (1992); *Murray v. Department of the Army*, 40 M.S.P.R. 250, 257-258 (1989). *See also Oglesby v. United States Postal Service*, 51 M.S.P.R. 202, 205-207 (1991).

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD:

Carol J. Teather
Administrative Judge

## NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the administrative judge may vacate the initial decision in order to accept a settlement agreement into the record. *See* 5 C.F.R. § 1201.112(a)(5).

## NOTICE TO APPELLANT

This initial decision will become final on **February 9, 2004**, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if this initial decision is received by you more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial

decision. The date on which the initial decision becomes final also controls when you can file a petition for review with the Equal Employment Opportunity Commission (EEOC) or with a federal court. The paragraphs that follow tell you how and when to file with the Board, the EEOC, or the federal courts. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file your petition with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.,
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), or personal or commercial delivery. A petition for review may also be filed by electronic mail (e-mail) if the petitioning party makes an election under 5 C.F.R. § 1201.5(f), which requires a written statement of the election that includes the e-mail address at which the party agrees to receive service. Such an election may be filed by e-mail at the following address: e-FilingHQ@mspb.gov.

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. The date of filing by mail is determined by the postmark date. The date of filing by fax or e-mail is the date of submission. The date of filing by personal delivery is the date on

which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. If the petition is filed by e-mail, and the other party has elected e-Filing, including the party in the address portion of the e-mail constitutes a certificate of service.

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION REVIEW

If you disagree with the Board's final decision on discrimination, you may obtain further administrative review by filing a petition with the EEOC no later than 30 calendar days after the date this initial decision becomes final. The address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 19848
Washington, D.C. 20036

## JUDICIAL REVIEW

If you do not want to file a petition with the EEOC, you may ask for judicial review of both discrimination and nondiscrimination issues by filing a civil action. If you are asserting a claim under the Civil Rights Act or under the Rehabilitation Act, you must file your appeal with the appropriate United States district court as provided in 42 U.S.C. § 2000e-5. If you file a civil action with the court, you must name the head of the agency as the defendant. *See* 42 U.S.C. § 2000e-16(c). To be timely, your civil action under the Civil Rights Act, 42 U.S.C. § 2000e-16(c) must be filed no later than 30 calendar days after the date this initial decision becomes final. If you are asserting a claim under the Age Discrimination in Employment Act, your claim must be filed with the appropriate United States district court as provided in 29 U.S.C. § 633a(c). In some, but not all districts you may have up to 6 years to file such a civil action. *See* 28 U.S.C. § 2401(a).

If you choose not to contest the Board's decision on discrimination, you may ask for judicial review of the nondiscrimination issues by filing a petition with:

The United States Court of Appeals
for the Federal Circuit
717 Madison Place, NW.
Washington, DC 20439

You may not file your petition with the court of appeals before this decision becomes final. To be timely, your petition must be received by the court of appeals no later than 60 calendar days after the date this initial decision becomes final.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent by regular mail this day to each of the following:

Appellant

Carmen K. Rodriguez
160 E. San Antonio Avenue
Dededo, GU 96929

Appellant's Representative

David J. Highsmith, Esq.
Law Office of David J. Highsmith, PC
Suite 209, Union Bank Bldg.
194 Hernan Cortes Avenue
Hagatna, GU 96910

Agency's Representative

Robert E. Sutemeier
Associate General Counsel
Department of Defense Education Activity
Office of General Counsel
821 San Carlos Road, Building 3813
NAS Pensacola, FL 32508-5531

Other

Kenneth L. Bates
U.S. Office of Personnel Management
Employee Relations Division
1900 E Street, NW, Room 7412
Washington, DC 20415

| | |
|---|---|
| January 5, 2004 | Lissette Duran-Leutz |
| (Date) | Legal Assistant |